**HOOSIER ENVIRONMENTAL COUNCIL, INC, Protect Our River Environment, Protect Our Woods Inc, Plaintiffs,**

**v.**

**U.S. ARMY CORPS OF ENGINEERS, ROBERT M. Walker, in His Official Capacity as Acting Secretary of the U.S. Department of the Army, Joe N. Ballard, Lieutenant General, in His Official Capacity as Commander and Chief of Engineers of the U.S. Army Corps of Engineers, Harry L. SPEAR, Colonel, in His Official Capacity as District Commander, Louisville District, RDI/Caesars Riverboat Casino, LLC, Defendants.**

No. IP98–0606–C–M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 19, 2000.

958

Keith Guthrie, Elizabethtown, IN, Michael A Mullett, Mullett & Associates, Indianapolis, IN, for plaintiffs.

Sue Hendricks Bailey, Office of the U.S. Attorney, Indianapolis, IN, Ronald E Elberger, Bose McKinney & Evans, Indianapolis, IN, Thomas A Lorenzen, Environmental Defense Section, Washington, DC, Bradley L Williams, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter comes before the Court on cross-motions for summary judgment filed by the plaintiffs and the government defendants on September 21, 1999. At issue is whether the United States Army Corps of Engineers, Robert M. Walker, Lt. Gen. Joe N. Ballard, or Col. Harry L. Spear (collectively the "COE" or the "COE and its officers"), in issuing a permit to RDI/Caesars Riverboat Casino, L.L.C. ("Caesars") for construction and operation of its riverboat gambling facility, violated the Administrative Procedures Act, 5 U.S.C. §§ 701–706 ("APA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d ("NEPA"), the Clean Water Act, 33 U.S.C. §§ 1251–1387 ("CWA"), and section 10 of the Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 403 ("RHA"). The plaintiffs seek a ruling from the Court that will invalidate the permit issued to Caesars in February of

1998, remand the case to the COE for further review, and enjoin the operation of Caesars' riverboat casino and hotel resort complex until such review is completed. For the reasons fully expressed below, the Court **GRANTS** the defendant's motion for summary judgment, and **DENIES** the plaintiffs' cross-motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During the May 1994 primary election, the citizens of Harrison County, Indiana, voted by referendum to authorize a riverboat gaming operation on the county's southern border along the Ohio River. Indiana law allows such a vote by citizens in the counties contiguous to Lake Michigan, the Ohio River or Patoka Lake. Ind. Code § 4–33–1–1; § 4–33–6–19. Before a gaming operation can be constructed, however, an abundance of regulatory procedures and state and federal agencies must be satisfied. One of the most prominent agencies, the Indiana Gaming Commission (the "IGC"), was established by the General Assembly to administer, regulate and enforce the state's riverboat gambling system. Ind.Code §§ 4–33–3–1, 4–33–4–1. The IGC has the power to determine who is entitled to a riverboat gambling license and in what area the vessel may be located. *Id.* § 4–33–4–13(b). It makes this decision after consulting with the COE about the waterways that are navigable for purposes of riverboat gambling operations and the proper routes and stops of such vessels. Ind.Code § 4–33–4–10, 4–13. Only after the applicant secures the COE's approval for the operation of a riverboat on a specific waterway may the IGC issue a license for such operation. *Id.* § 4–33–4–13(b); § 4–33–4–20 (voiding license if COE rescinds an approval).

State law allows the IGC to issue a total of eleven licenses for riverboat gaming operations at any one time. Only five licenses, however, are available for opera-

tions along the Ohio River, with no more than one riverboat per county. Ind.Code §§ 4–33–6–1(a), 6–1(a)(5). Voter approval of riverboat gambling in the abstract must be obtained before a license may be issued for any riverboat to be docked in a county. Ind.Code § 4–33–6–19. Next, the county fiscal body must approve an ordinance permitting the docking of the riverboat in the county. Ind.Code § 4–33–6–18(c). Once those two steps are taken, potential riverboat owners must apply for and obtain one of the five Ohio River licenses. Part of that process involves convincing the IGC to select its project as the one that offers the most economic development and best serves the interests of the citizens of Indiana. One step along the way is to obtain a Certificate of Suitability from the IGC.

In an attempt to earn one of these licenses, defendant Caesars, on April 1, 1996, applied to the COE for a permit under § 10 of the Rivers and Harbors Appropriations Act of 1899 ("RHA"), § 403 and § 404(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(b). App. to Am. Compl. for Decl. and Inj. Rel. ("Compl."), Ex. 1, Statement of Findings and Env'l Assess. by Col. Harry L. Spear ("Col.Spear"), Commander and District Engineer, Louisville Dist. U.S. COE, Feb. 10, 1998, (hereafter "Findings") at 1. The application requested authorization under the two environmental laws to construct a permanent mooring facility for a riverboat gambling vessel on the banks of the Ohio River near Bridgeport, in Harrison County (the "Townsend Site").[1] Findings at 1. Caesars' proposed gambling vessel was a multi-level riverboat with a deck level dimension of approximately 105 feet by 450 feet long, intended to hold approximately 4,000 passengers and 400 staff members. Findings at 2. Indiana law prohibits any gambling on a riverboat while it is docked, with certain exceptions related to weather,

---

**1.** There is no dispute that the IGC granted Caesars a Certificate of Suitability for its proposed site on May 20, 1996, after it had considered four alternative sites. That Certif-

icate was for operation of a riverboat gaming vessel at the Townsend Site in Harrison County owned by Caesars. Findings at 56.

water or traffic conditions. Ind.Code § 4–33–9–2. To enable the proposed riverboat vessel to cruise as required by Indiana law, Caesars needed to dredge approximately 28,000 cubic yards of material from the river bottom. Findings at 1. Because Kentucky law prohibits gambling and the state line is closer to the Indiana bank of the river at this point, Caesars also needed to excavate from the river bank along the cruising lane, construct mooring piles both in the water and on the bank, and stabilize a section of the bank to facilitate its operations. *Id.* at 1–2, 33, 64. Thus, the COE permit was a necessary step toward getting IGC approval for a riverboat gambling license for development on Caesars' Bridgeport, Indiana, property.

Nearly two years after receiving Caesars' initial application, Col. Spear released his Findings, on February 10, 1998, which included an Environmental Assessment of Caesars' proposed riverboat gambling project. Amend. Compl. Ex. 1, Findings at 69. Col. Spear had specifically found that the project would have no significant impact on the human environment, which is formally considered a "finding of no significant impact" ("FONSI"). *Id.*; *see* 33 C.F.R. §§ 230.10–230.11 (allowing an environmental assessment instead of an environmental impact statement when there is a FONSI). Nevertheless, in response to the comments and additional information he had received from state and federal agencies and members of the public during the public interest review, Col. Spear added numerous special conditions to the permit to limit, prevent or mitigate the environmental impacts he identified in the environmental assessment. Findings at 47, 59–69. As a result, the RHA and CWA permit issued to Caesars for construction and operation of its project contained all of the standard conditions and some thirty-four special conditions. *Id.* at 69–73.

Because of the FONSI, Col. Spear determined that an Environmental Impact Statement ("EIS"), pursuant to § 102 of NEPA, would not be necessary. *Id.* at 58, 69. Section 102 expresses our national commitment to considering the environmental impact of actions and decisions by the executive agencies of the federal government. *See generally,* 42 U.S.C. § 4332. Specifically, the law requires that "all agencies of the Federal Government ... include in every recommendation or report on ... major Federal actions *significantly affecting* the quality of the human environment, a detailed statement by the responsible officer on—(I) the environmental impact of the proposed action...." 42 U.S.C. § 4332(2)(C) (emphasis added). By finding no *significant impact* from the project, the COE was authorized both by the statute and by Department of the Army regulations not to prepare an EIS before issuing a permit. *See* 33 C.F.R. § 230.10–11.

After the permit was approved by the COE, February 10, 1998, Caesars began construction below the Ordinary High Water Mark ("OHWM"). Construction above the OHWM had already commenced in November of 1997. Findings at 68. The project itself, located approximately ten miles south of the City of New Albany, Indiana, included the gaming vessel, as well as a 500 room hotel, an entertainment complex, a golf academy, parking for 3,200 vehicles, and an off-site eighteen-hole golf course. Administrative Record ("AR"), Vol. II, Tab 1, Traffic Study dated Dec. 1995 at 1 ("Traffic Study"); Findings at 2. The entire complex is located directly across the river from the City of Louisville, the most populous metropolitan area in the State of Kentucky, and is accessed by Indiana State Road 111. Traffic Study at 1; Findings at 13. The land-side facilities also included a deep-water well and water treatment plant for potable water, which were to be deeded to the Town of Elizabeth upon completion, and a wastewater treatment plant. Findings at 2, 67. These land-side structures constitute the elements of the project begun before the permit issued. Findings at 68.

Throughout its review of Caesars' permit application, the COE received many

comments from the public, including the plaintiff organizations, Hoosier Environmental Council, Inc. ("Hoosier"), Protect Our Woods, Inc. ("POW"), and Protect Our River Environment ("PORE"). The members of these organizations are people interested in preserving and protecting the environment in Indiana, and they opposed construction of the riverboat gaming facilities on Caesars' property. Hoosier is a not-for-profit corporation whose purpose is "to further public understanding of the value and need for the preservation of nature, natural resource conservation and recovery, and the promotion of a healthy and safe environment." Pls.' Opp. to Def. Caesars' Mot. to Dis., Ex. 3, Hoosier's Articles of Incorporation, Art. II; Def. Caesars' Mot. to Dis., Ex. 3, Hoosier's Bylaws, Art. II.

Plaintiff, POW, a not-for-profit corporation formed in July of 1990, was established "to educate the public about environmental issues related to the Hoosier National Forest and other public and private forests, lands, and waters; to participate in the planning of the use and management of [those areas]; to monitor public and private activities on [those areas]; to conduct research and other scientific inquiry regarding the use and management of [those areas]; to participate in other local, regional, state, national, and global endeavors designed to promote a safe, sustainable environment; and to facilitate the interests of its members in pursuit of these purposes." Pls.' Opp. to Mot. to Dis., Ex. 5, POW's Articles of Incorporation, Art. II. PORE is an unincorporated association comprised of "citizens and friends of Southeastern Harrison County." *Id.*, Ex. 4, October 1994 Resolution for the Creation of PORE. Its mission includes promoting "orderly, planned development that will improve the quality of life," and opposing "any attempt to locate a gambling casino on the Ohio River" in their area of Harrison County. *Id.* PORE is associated with

and functions as a committee of POW. Frey Dep. at 11–12.

Hoosier, POW and PORE filed this action on May 6, 1998, nearly three months after the COE granted Caesars' § 404 permit and six months after construction began at the site. They claim that the COE's decision to issue the permit, without ensuring that the § 404 guidelines were met by preparing an EIS, or conducting an adequate public interest review, was in violation of NEPA, the CWA and the RHA.[2] Several procedural and dispositive motions have been resolved in this matter. In March of 1999, the Court granted defendant Caesars' motion to dismiss the claim against it based on the plaintiffs' lack of standing to sue a beneficiary of challenged agency action. Caesars promptly filed a motion to reconsider that decision, or in the alternative, to intervene, followed by a motion for summary judgment on the merits filed June 18, 1999. Several months later, the plaintiffs and the COE filed the pending cross-motions for summary judgment. Recently, the Court denied Caesars' motion to reconsider and its request to intervene in an order dated May 4, 2000. As a result of that decision, the Court will not address any issues raised in Caesars' motion for summary judgment. Instead, it will consider and resolve the cross-motions for summary judgment pending between the plaintiffs and the COE.

## II. DISCUSSION

### A. Administrative Procedures Act

Hoosier, POW and PORE filed this action under § 702 of the APA, a statute that provides a means for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to obtain judicial review of that action. 5 U.S.C. § 702. The scope of that

---

**2.** At no time, however, have the plaintiffs sought a preliminary injunction against Caesars, or a stay of the effective date of the

COE's action. *See* 5 U.S.C. § 705 (allowing for relief pending review).

judicial review is delineated in § 706, which states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \* \* \* \* \* \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> \* \* \* \* \* \*
>
> (D) without observance of procedure required by law;

5 U.S.C. § 706(2). When it makes these determinations, the court must "review the whole record or those parts of it cited by a party." *Id.*

■■■ In an action for review of the grant of a § 404 permit, courts must examine the administrative record to determine whether the COE "made an arbitrary or capricious decision, abused its discretion, acted contrary to law or regulation, or lacked the support of substantial evidence." *St. Clair v. Secretary of Navy,* 155 F.3d 848, 850 (7th Cir.1998). This standard is deferential, and a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* In fact, "administrative decisions should be set aside . . . only for substantial procedural or substantive reasons as mandated by statute . . . not simply because the court is unhappy with the result reached." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Coun.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Nevertheless, a court is charged with responsibility for making sure the COE took a "hard look" at the potential environmental impact of any proposed project, and based its decision on a "rational consideration of relevant factors." *Van Abbema v. Fornell,* 807 F.2d 633, 636 (7th Cir.1986).

■■■ The COE is a federal agency whose actions may be reviewed under § 702 of the APA. Hoosier, POW and PORE, claiming to be aggrieved by the agency's action,[3] challenge the COE's decision to issue a permit to Caesars in four basic areas. First, they contend that the analysis of alternatives conducted by the COE's district engineer, Col. Harry L. Spear ("Col.Spear"), was arbitrary, capricious and contrary to the law. Second, they offer five reasons why the Court should find that Col. Spear did not comply with NEPA in conducting his assessment of the environmental impacts of the project. Next, they argue that his finding that the project would have no significant impact on the quality of the human environment was wrong as a matter of law, and that he should have conducted an EIS. Finally, they assert that, because of Col. Spear's inadequate analyses of the environmental impacts and reasonable alternatives, the COE failed as a matter of law to conduct an appropriate public interest review.

In response, the COE points to the thirty-seven volume administrative record, compiled over a twenty-two month period, arguing that it demonstrates how thoroughly the District Engineer reviewed and considered the information submitted by the proponents, opponents, consultants, and other agencies interested in this project. According to the COE, the record shows that, even though Caesars had obtained a site-specific Certificate of Suitability from the Indiana commission, the District Engineer's review considered a range

---

**3.** No dispute has been raised about whether the environmental associations that are plaintiffs in this action have standing to sue the COE under the APA, and the Court finds no reason to doubt that such standing exists. Nor has the case become moot as a result of the project's completion and current operation. *See Van Abbema,* 807 F.2d at 636 (injuries that flow from "unsanctioned issuance" of a permit occur both in construction and operation of facility).

of alternative locations as well as project modifications. He also considered the reasonably foreseeable direct, indirect, and cumulative impacts of the riverboat project, including its potential effects on air quality, traffic, floodplain values, and adjacent mussel beds. Finally, the COE notes that the record is full of pre-existing approvals by state agencies relating to air, traffic, and water quality, which supports the COE's conclusion that the project would have no significant impact on the human environment and that an EIS was unnecessary.

Before addressing these contentions, the Court will briefly review the environmental laws being administered by the COE in deciding whether to grant a permit to Caesars.

### B. Environmental Laws and Regulations

In the past, the COE's regulation of certain activities in the nation's waters primarily focused on protecting navigation. 33 C.F.R. § 320.1(a). Since the late 1960s, however, the COE has been charged with additional responsibility for considering the "full public interest by balancing the favorable impacts [of a given action] against the detrimental impacts, ... known as the 'public interest review.'" *Id.* It does this through a process by which a permit is issued before certain types of activities can occur in connection with the navigable waters and waters of the United States.[4] *Id.* § 320.1(b). The COE has delegated its decision-making authority to thirty-six district engineers and eleven division engineers, who administer the regulatory program in accordance with procedures described in the COE's regulations. *See* 33 C.F.R. Pts. 325, 330. Col. Spear is

the District Engineer for the district in which Caesars' property is located. In administering the permit program, the COE "seeks to avoid unnecessary regulatory controls." 33 C.F.R. § 320.1(a)(3). It also strives to reduce paperwork and delays, and "believes that state and federal regulatory programs should complement rather than duplicate one another." *Id.* § 320.1(a)(4), (5). To that end, the COE "uses general permits, joint processing procedures, interagency review, coordination, and authority transfers (where authorized by law) to reduce duplication." *Id.* § 320.1(a)(5).

■ Like all federal agencies, the COE is required to implement the policies of National Environmental Policy Act of 1969 ("NEPA") in its decision making. *See* 42 U.S.C. § 4332; 40 C.F.R. § 1507.1; *see also Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). Those policies include using

all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a). NEPA's "twin aims" are to place upon agencies "the obligation to consider every significant aspect of the environmental impact of a proposed action," and to "ensure that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas*, 462 U.S. at 97, 103 S.Ct. 2246. To these ends, NEPA contains certain "action forcing" provisions that compel federal agencies to

---

4. The regulations note a distinct difference between the terms "navigable waters" and "waters" of the United States. "Navigable waters of the United States are ... waters that are navigable in the traditional sense...." 33 C.F.R. § 320.1(d). Those include "waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark, and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce." 33 C.F.R. §§ 322.2(a), 329.4. On the other hand, "waters of the United States ... include more than navigable waters where permits are required for the discharge of dredged or fill materials pursuant to section 404 of the Clean Water Act." *Id.*

consider "the environmental impact of their actions and decision-making." *Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). However, NEPA does not require an agency to "elevate environmental concerns over other appropriate considerations." *Baltimore Gas,* 462 U.S. at 97, 103 S.Ct. 2246. Rather, it just requires the agency to take a "hard look" at environmental consequences before acting. *Id.* Thus, the COE must abide by NEPA regulations when undertaking its public interest review and consideration of alternatives to a proposed action. 40 C.F.R. § 1500.2 (federal agencies shall interpret and enforce the law in accordance with NEPA policies and regulations); § 1507.1 (federal agencies shall comply with NEPA regulations). NEPA's requirements, however, are essentially procedural. *Strycker's Bay Neighborhood Coun., Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (citing *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

■ The COE must also comply with regulations for issuing a § 404 permit under the CWA, a statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); 40 C.F.R. § 230.2. Section 404 of the CWA governs the discharge of dredged or fill material into the waters of the United States.[5] 33 U.S.C. § 1344(b). Pursuant to this section, the COE is responsible for issuing permits for such dredging or filling activities. *See* 33 U.S.C. § 1344(d). It also retains its historical duties under the RHA, the relevant portion of which, for

purposes of this discussion, is the section that prohibits the construction of any structures in, or the excavation, filling, or altering of, any navigable waters in the United States without the recommendation and approval of the Chief of Engineers and the Secretary of the Army. 33 U.S.C. § 403; *see also* 33 U.S.C. § 1371(b). In general, the substantive statutes require the COE to focus on the project's effect on overall water quality (the CWA) and its effect on navigation (the RHA).

Upon receipt of Caesars' application for a permit, the COE was obligated to evaluate the proposed Ohio River project using procedures and requirements outlined in the regulations construing NEPA and applying it to the COE, and those that implement the RHA and CWA through the COE. 40 C.F.R. §§ 1500 to 1508, 33 C.F.R. § 230, §§ 320–330. Essentially, the same process used for a § 404 permit under the CWA applies to the review of a permit under § 10 of the RHA, as both are subject to NEPA and COE regulatory process. *See* 33 U.S.C. § 1371; 33 C.F.R. § 320.2(b), (f). The COE's own regulations describe the basic sequential steps for evaluating a permit application from start to finish. 33 C.F.R. § 325. The Court will discuss the various issues raised by the parties in light of these steps, considering NEPA's procedural, and the CWA and RHA substantive requirements, as they pertain to resolving each issue.[6] Generally, the steps include:

1. Acknowledging receipt of and reviewing for completeness the application form, 33 C.F.R. § 325.2(a)(1);

2. Issuing a public notice to advise all interested parties of the proposed

---

**5.** For purposes of the CWA, waters of the United States include "all wetlands adjacent to navigable or interstate waters and their tributaries." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 129, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); 40 C.F.R. § 230.3(s)(7); 33 C.F.R. § 328.3. "Wetlands" include "lands that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for

life in saturated soil conditions." *Id.*; 33 C.F.R. § 328.3(b). Caesars' property contained less than one acre of designated wetlands. Findings at 25, 49.

**6.** Although this order of discussion departs somewhat from the plaintiffs' presentation of the issues, it seems more logical and reasonable in light of the steps prescribed by COE regulations and the fact that the Court's task is limited to a deferential review of the process followed and law applied by the COE.

activity for which the permit is sought and solicit comments and information necessary to evaluate the public interest, *Id.* §§ 325.2(a)(2), 325.3(a);

3. Considering all comments received in response to the public notice, making them part of the administrative record, and referencing them in subsequent actions on the application, *Id.* § 325.2(a)(3);

4. Seeking advice of and consulting with other federal agencies whose special expertise is invoked by certain comments, *Id.*;

5. If necessary, soliciting the applicant's views or responses to the comments received, *Id.*;

6. Conducting an environmental assessment ("EA"),[7] and, if necessary, preparing an environmental impact statement ("EIS") pursuant to NEPA,[8] *Id.* § 325.2(a)(4);

7. Determining the need for a public hearing pursuant to 33 C.F.R. § 327, *Id.* § 325.2(a)(5);[9]

8. Determining, in light of the above and in accordance with the record and applicable regulations, whether the permit should be issued, *Id.* § 325.2(a)(6);

9. Preparing a Statement of Findings (SOF), or if an EIS has been prepared, a Record of Decision (ROD), on all permit decisions, which includes the District Engineer's "views on the probable effect of the proposed work on the public interest including conformity with the guidelines published for the discharge of dredged or fill materials into waters of the United States," *Id.*;

10. If a permit is warranted, determining the special conditions, if any, that apply to the permit and the duration of same,[10] *Id.*;

7. An EA is a "concise public document" that briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. 40 C.F.R. § 1508.9(a). It must include brief discussions of the need for the proposal, of alternatives, of the environmental impacts of the proposed action and the alternatives, and a listing of agencies and persons consulted. *Id.* § 1508.9(b).

8. An EIS is "a detailed written statement as required by section 102(2)(C) of the [NEPA]." 40 C.F.R. § 1508.11. That section requires all federal agencies to "include in every recommendation or ... other major Federal actions significantly affecting the quality of the human environment, a detailed statement ... on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv)the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

9. A public hearing will be held whenever it is deemed necessary for making a decision about a permit application. 33 C.F.R.

§ 327.4(a). When a member of the public requests a hearing on an application during the comment period, the District Engineer may try to resolve the issues informally. Barring that, the District Engineer must promptly set a time and place for a hearing, unless the District Engineer determines "that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." *Id.* § 327(b). In that case, the District Engineer must make such a determination in writing and communicate it to the persons requesting a hearing. *Id.* When in doubt, the District Engineer should hold a hearing. *Id.* § 327.4(c).

10. Special conditions may be added to a permit "when such conditions are necessary to satisfy legal requirements or to otherwise satisfy the public interest requirement." 33 C.F.R. § 325.4(a). Permit conditions should be "directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable." *Id.* If, however, the District Engineer determines that special conditions are necessary to ensure the proposal is not contrary to the public interest, but those conditions would not be enforceable, the permit must be denied. *Id.* § 325.4(c).

11. If the final decision is to deny the permit, advising the applicant in writing of the reasons for the denial, *Id.* § 325.2(a)(7);

12. Publishing a list of permits issued or denied each month and distributing same to all interested persons, *Id.*

At step 8, before deciding to issue the permit, the agency must consider whether there are practicable alternatives to an action that has an adverse environmental impact on water quality. 40 C.F.R. § 230.10(a). Likewise, it must consider the probable impacts of the proposed activity on the public interest, and balance those impacts against the reasonably foreseeable benefits before issuing a permit. 33 C.F.R. § 320.4(a)(1).

As is clear from this summary of the COE's tasks, the permit application process does not end when the COE makes a finding of no significant impact (FONSI).[11] *Van Abbema,* 807 F.2d at 637. Instead, the COE must follow "two distinct, if parallel, guidelines in issuing a permit after a FONSI." *Id.* First, it must "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (NEPA alternatives requirement); *see also* 40 C.F.R. § 230.10(a) (EPA's requirement pursuant to CWA); *Van Abbema,* 807 F.2d at 638. Second, the COE may not issue a permit until after it conducts a "general public interest review" to determine that the benefits outweigh the detriments of the proposal. *Van Abbema,* 807 F.2d at 638; 33 C.F.R. § 320.4(a). With respect to consideration of alternatives, the COE is required by regulations implementing the CWA to "examine practicable alternatives to the proposed discharge, that is, not

discharging into the waters of the U.S.[,] or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. § 230.5(c); *see also* 40 C.F.R. § 230.10(a) (no discharge of dredged or fill material allowed if there is a practicable alternative that would have less adverse impact on aquatic ecosystem). To be considered "practicable" an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

Similarly, after making a FONSI, the COE must evaluate the probable impacts, including indirect and cumulative impacts, of the proposed activity and its intended use on the public interest. 33 C.F.R. § 320.4(a). The COE weighs all of the comments, reports, and data collected in connection with the application, and then balances the "benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." *Id.* This balancing is performed with reference to twenty factors specified in the regulations. *Van Abbema,* 807 F.2d at 636 (citing 33 C.F.R. § 320.4(a)). Although the factors are to be balanced by the COE when determining whether to issue a permit, the specific weight of each factor depends on its "importance and relevance to the particular proposal." 33 C.F.R. § 320.4(a)(3). In addition, "full consideration and appropriate weight" should be given to "all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." *Id.* After balancing the overall positive and negative effects of a project, the COE is able to decide whether to issue the permit, and what conditions should be attached to it.

---

**11.** A FONSI is a written document by a Federal agency that briefly presents the reasons why an action will not have a significant effect on the human environment, and states that an EIS, therefore, will not be prepared. 40 C.F.R. § 1508.13. "Human environment shall be interpreted comprehensively to include the natural and physical relationship of people with that environment." *Id.* § 1508.14. Economic and social effects, however, "are not intended by themselves to require preparation of an environmental impact statement." *Id.*

*Id.,* § 320.4(a). Generally, a permit should be granted unless the District Engineer specifically determines that "it would be contrary to the public interest." *Id.*

### C. COE's Environmental Assessment

■ Having summarized the relevant procedural and substantive laws, the Court now turns to a consideration of whether the COE properly followed the process and applied the law in reaching its decision to issue a § 404 permit to Caesars. As an initial matter, the Court notes that COE regulations describe the issuance of a permit as an action that normally requires only an EA, and not necessarily an EIS. 33 C.F.R. § 230.7(a). In any case, the purpose of an EA "is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *River Rd. Alliance v. Corps of Eng. of U.S. Army,* 764 F.2d 445, 449 (7th Cir.1985), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). Thus, preparation of an EA leads either to a FONSI, or to a finding that an EIS is required, in which case additional time and expense will be incurred. *Rhodes v. Johnson,* 153 F.3d 785, 788 (7th Cir.1998). In this case, the EA led to a FONSI.

Caesars' application was filed with the COE on April 1, 1996, but was not complete until late July 1996, following which the COE issued a public notice of the completed permit application on August 13, 1996. AR, Vol. III, Tab 27, Aug. 13, 1996 Public Notice. That notice began a comment period that ended on September 11, 1996. *Id.* On September 23, 1996, the COE issued notice of a public hearing to be held on October 23, 1996, in Lanesville, Indiana. *Id.* The COE invited all interested parties to attend the hearing in person or by representative, and to make their views known. *Id.* Alternatively, written statements could be submitted by mailing them to the COE by November 7, 1996, and all statements, oral or written, would be presented at the hearing, become part of the administrative record, and be avail-

able for public review. *Id.* On October 18, 1996, the COE issued notice of the first set of project modifications in response to comments that had been received earlier. *Id.,* Oct. 18, 1996, Public Notice. Another comment period followed and ended on November 7, 1996. *Id.*

The public hearing was held on October 23, 1996, and a transcript of the hearing was made a part of the administrative record. AR, Vol. V, Tab 60, Hrg. Trans. Public notice of a second set of project modifications was issued on February 11, 1997, after which another thirty-day comment period ensued until March 13, 1997. AR, Vol. III, Tab. 27. Numerous comments were received by the COE during this comment period, many of which asked for a second public hearing. *Id.,* May 29, 1997, Public Notice. Finding that the "public's concerns pertaining to the modification … have been properly identified through the comment period and sufficient detail was obtained to adequately assess these specific issues," Col. Spear denied the requests for a second public hearing. *Id.* The final public notice on March 2, 1998, announced that a Department of the Army Permit was issued to Caesars on February 10, 1998, and it listed all of the special conditions attached to the permit. *Id.,* Mar. 2, 1998, Public Notice. The COE's corresponding statement of findings, environmental assessment and FONSI were included in the administrative record. AR, Vol. XVI, Tab 227.

Based on this review of the administrative record, the Court is satisfied that the COE followed the proper procedures with respect to steps one through three, seven, and ten through twelve, as described above. The disputes between the parties in this action primarily revolve around whether the District Engineer properly followed NEPA procedures and all relevant laws in connection with his decision-making at steps four through six, with particular emphasis on step six, and at steps eight and nine. The Court will focus its analysis on these steps of the adminis-

trative review process and the decisions made by the COE at each point.

### 1. Indirect Effects

■ First, the plaintiffs argue that the COE failed to identify and evaluate the reasonably foreseeable indirect effects of the proposed project. They point to a letter from the United States Fish & Wildlife Service ("USFWS") asking the COE to conduct an EIS because of the "ecologically sensitive nature of the project area and the potential indirect impacts that would result from siting of such a large development in an essentially undeveloped rural area." AR, Vol. X, Tab 108, Letter to Col. Spear dated April 11, 1997. In addition, they cite a letter from the EPA, dated more than two months after the § 404 permit was granted, which allegedly concludes that the EA was "legally deficient" because of its failure to examine indirect effects. Pls.' Brf. in Supp. of Mot. for Sum. J. ("Brf. in Supp.") at 24. However, this letter is not part of the administrative record on which the COE based its decision and should not be considered during a judicial review of that decision, unless the information is necessary to explain or clarify agency action. *See Friends of the Earth v. Hintz*, 800 F.2d 822, 828–29 (9th Cir.1986) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Northern Crawfish Frog v. The Federal Highway Administration*, 858 F.Supp. 1503, 1508 (D.Kan.1994) (judicial review focuses on administrative record existing before the agency). The EPA letter offered by the plaintiffs here does not clarify or explain the COE's administrative decision, which means this Court should not consider it in this review. The COE has moved to strike this exhibit and that motion is hereby **GRANTED.**

■ Even if the letter were to be considered, however, it would not lend much assistance to the plaintiffs. It appears that the EPA wrote the letter thinking it was providing feedback to the COE prior to the issuance of a permit while the administrative review process was ongoing.

Once the permit was awarded, the EPA could have sought review of Col. Spear's decision at a higher level of the COE, or exercised its authority to veto the permit entirely under 33 U.S.C. § 1344(c). Because it did not take this action, the Court finds it reasonable to infer that the EPA might have tempered its feedback had it known the permit had already issued. *See Hill v. Boy*, 144 F.3d 1446, 1448 (11th Cir.1998) (noting that EPA did not seek to overrule the COE's issuance of a § 404 permit); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1525 (10th Cir. 1992) (EPA may veto the issuance of a permit that will have an "unacceptable adverse effect," noting that was not done); *James City County v. United States Env. Prot. Agcy.*, 955 F.2d 254, 260 (4th Cir. 1992) (holding that case should be remanded for EPA to consider whether project's environmental effects alone justified veto of permit). The EPA is authorized to veto a § 404 permit whenever it "determines that the discharge of dredged or fill material is having or will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas, . . . wildlife, or recreational areas." 40 C.F.R. § 231.1(a) (quotations omitted). In light of this veto authority, it is difficult to read the EPA's letter as condemning the COE's review as "legally deficient," especially when the EPA took no subsequent action to overrule or otherwise challenge the COE's decision.

Moreover, the Court has reviewed the letter cited by the plaintiffs and at no point does the EPA conclude that the COE's EA is legally deficient for any reason. Instead, the EPA stated in the letter that its purpose for writing was to share its "comments and concerns regarding the EA and the proposed river boat project." Pls.' Ex. C, Letter to Col. Spear dated April 15, 1998. In its conclusion, the EPA recommended that the COE "give further consideration to the issues raised in this letter," and it invited the COE to meet with EPA staff to discuss those issues. *Id.* Given the cooperative tone of this feed-

back, the Court finds it unlikely that, had it known the permit had already been granted, the EPA would have accused the COE's assessment of being legally deficient. Such a missive would be inconsistent with the EPA's subsequent conduct of not taking any action to garner further review of the permit application or to veto it. Thus, the plaintiffs' interpretation of the significance of this letter is unreasonable and would not have supported their argument that the COE was unreasonable with regard to its assessment of the indirect effects of the project.

Indirect effects are those effects that "are caused by an action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). For example, the direct effects of the COE's action of granting a § 404 permit to Caesars, is that Caesars would begin to dredge the Ohio River to form a protected mooring basin and widen the cruising lane for its riverboat gaming vessel. Another direct effect is that Caesars would be eligible for a gaming license from the State of Indiana for its riverboat. One could even say that the actual operation of the riverboat constitutes a direct effect of the grant of a permit. The indirect effects, on the other hand, would include construction of a hotel, pavilion, golf academy, golf course, and parking and utility facilities. These indirect effects are both foreseeable and were thoroughly analyzed by the COE prior to issuance of the permit. *See* Findings at 47–54.

In addition, the COE evaluated the potential environmental effects of these foreseeable indirect effects of the grant of the permit. The Findings contain comments, responses from the applicant, summaries of reports and of interagency meetings, and the COE's findings about the historical and archaeological effects of the entire project, its effect on air quality, aesthetics, noise levels, water supply, wetlands, benthic community, fishery areas, wildlife areas, rare and endangered species, water quality, recreational areas, and the general ecology of the area. *Id.* at 47–

58. After considering all of these effects, in light of his experience, knowledge, and training, and considering the comments and advice received from other agencies, the District Engineer found that the foreseeable development that would follow a grant of the § 404 permit "would not have a significant impact on the human environment." *Id.* at 58. His decision contemplated both the proposed work and the mitigation features added to the project. *Id.* The COE is in the best position to make this evaluation, because it involves factual disputes, "the resolution of which implicates substantial agency expertise." *See Marsh v. Oregon Nat. Res. Coun.*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The District Engineer heard live testimony and was able to gauge the intensity and sincerity of opinions expressed. *See River Road Alliance*, 764 F.2d at 451. The COE "also has a fund of knowledge and experience regarding the [river] that judges of a federal court ... cannot match." *Id.* Moreover, agencies are not required to hold a public hearing before issuing an EA, so when they do their "decision is entitled to greater weight." *Id.*

For NEPA to require consideration of a particular effect (such as the impact of secondary development), a court "must look at the relationship between that effect and the change in the physical environment caused by the major federal action at issue." *Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 773, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). Even if there is a sufficient "string of causation" to confer standing on the plaintiffs, "it does not necessarily follow that such a highly attenuated chain of causation ... would lead to injuries cognizable under NEPA." *Presidio Golf Club v. National Park Ser.*, 155 F.3d 1153, 1163 (9th Cir.1998). Instead, NEPA requires "a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metropolitan Edison*, 460 U.S. at 774, 103 S.Ct.

1556. Without some specific document, report, or comment in the record to call the COE's attention to foreseeable secondary development, its decision not to consider such effects cannot be found arbitrary, capricious, or otherwise unreasonable.

The plaintiffs argue that because the "fundamental purpose" of the riverboat casino is to "stimulate significant economic development over a large geographic area," the COE was obliged to analyze the environmental effects of such potential secondary development in light of this purpose. Pls.' Brf. in Supp. at 25. The Indiana law that established a gaming commission provided that one of the duties of the IGC is to "select among competing applicants the applicants that promote the most economic development in a home dock area...." Ind.Code § 4–33–4–1(a)(5). Further, it states that in granting a license, the IGC "may give favorable consideration to ... [a]pplicants presenting plans that provide for significant economic development over a large geographic area." Id. § 4–33–6–7(a). According to the plaintiffs, these passages "make clear that the fundamental purpose of the proposed casino complex is to stimulate significant economic development over a large geographic area." Pls.' Brf. in Supp. at 25.

Considering the passages in context, however, the Court notes their placement in the chapter governing the powers and duties of the Indiana Gaming Commission, not in the chapter containing "General Provisions" regarding the issuance of gaming licenses. This fact weakens the argument regarding the fundamental purpose of the casino. In addition, the first passage actually states two criteria for selecting applicants, one regarding economic development, and a second one requiring the IGC to select the applicants "that best serve the interests of the citizens of Indiana." Ind.Code § 4–33–4–1(a)(5). Presumably, those interests include environmental, aesthetic, social, land use, population density and growth, and other related interests. Further, with respect to the second passage, the Court notes that it is permissive, not mandatory, allowing the IGC to "give favorable consideration" to plans that provide for significant economic development. A clue as to the type of "economic development" envisioned by the legislature in connection with the casinos is found in a subsequent provision of this statute. Referring to the issuance of a license for operation of a riverboat in a large city, the statute calls for the applicant to "construct or provide for construction of an approved hotel" or "cause economic development" having an impact greater than would occur with construction of an approved hotel. Id. § 4–33–6–7(b). At most, these passages support the foreseeability of the type of economic development identified during the COE's review of Caesars' application, such as the hotel, pavilion, golf academy and golf course. They do not provide any reason for the Court to find arbitrary or capricious the District Engineer's decision that other secondary development was not reasonably foreseeable.

The plaintiffs combine the "fundamental purpose" they derived from the statute's provisions with a statement in the COE's Findings relating to the scope of analysis Col. Spear was undertaking, to show that he completely ignored secondary effects. The District Engineer defined the scope of his analysis as including all of the construction activities proposed by the applicant, including the off-site golf course. He stated, however, that he would "not speculate as to any secondary construction proposals by unknown third parties at unknown locations, for unknown purposes or their impacts within this NEPA document because they are not within the scope of [his] analysis." Findings at 46. Seizing on the term "speculate" in that statement, the plaintiffs cite cases in which courts have frowned on using the excuse that an effect is too speculative as a reason for not considering secondary effects. They argue that it was similarly impermissible for the COE to use it as an excuse here to ignore the potential secondary development effects.

In *Scientists Institute for Pub. Inf. v. A.E.C. ("SIPI")*, the court wrote that an "agency need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to a particular agency action involves some degree of forecasting." 481 F.2d 1079, 1092 (D.C.Cir.1973). The plaintiffs emphasize a subsequent passage in which the court summed up the "basic thrust" of agency responsibility under NEPA, which is to

> predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities ... by labeling any and all discussion of future environmental effects as "crystal ball inquiry."

*Id.* The context of this expansive conclusory language, however, is a review of the Atomic Energy Commission's refusal to issue a "detailed statement" of the significant impact its "Liquid Metal Fast Breeder Reactor" program would have on the human environment. *Id.* at 1082. The Commission declined to do so because its program was still in the "research and development stage," with no specific plan of implementation that would significantly affect the human environment. *Id.*

The *SIPI* court disagreed with the Commission's reasoning for not preparing a detailed statement of environmental effects. It held that an EIS was necessary, considering

> the magnitude of the ongoing federal investment in this program, the controversial environmental effects attendant upon future widespread deployment of breeder reactors should the program fulfill its present expectations, the accelerated pace under which this program has moved beyond pure scientific research toward creation of a viable, competitive breeder reactor electrical energy industry, and the manner in which investment in this new technology is likely to restrict future alternatives ....

*Id.* Unlike the court in *SIPI*, this Court is not faced with a controversial new technology that is being developed by the government at tremendous expense, which, if successful, could become so widespread that it would affect the entire country. Instead, the issues here arise in the context of a federal agency regulating private activity that might affect public property.

The indirect effects caused by the issuance of a § 404 permit to Caesars, which would allow it to construct a mooring basin and cruise lane for its riverboat casino, become increasingly tenuous and speculative as the inquiry proceeds outward from the core project. As previously discussed, the COE reviewed many indirect effects and environmental consequences of the grant of a permit, but refused to consider the environmental effects of any commercial development that might be spawned by the presence of the riverboat. In essence, the District Engineer found that such development was not reasonably foreseeable. Rather than direct the Court to evidence in the record that would show that the District Engineers' finding was arbitrary or capricious, such as evidence of proposed secondary commercial development in the area, the plaintiffs merely point to the stated aspirations of the riverboat gaming law passed by the state legislature. This is not enough to meet the plaintiffs' burden of showing the agency's decision was arbitrary or capricious. The COE's decision that it would not consider the environmental effects of possible secondary development that might occur in this rural area as a result of the resort's presence is not arbitrary or capricious. Rather, it complies with the rule of reason that governs the application of NEPA to any federal action. *Marsh*, 490 U.S. at 373, 109 S.Ct. 1851 (standard governing agency decision is "rule of reason"); *New York v. Kleppe*, 429 U.S. 1307, 1310, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976) (in evaluating the adequacy of an EIS, courts enforce requirement that agency take a "hard look" at environmental effects, tempered by "a practical rule of reason"); *Transmis-*

*sion Access Policy Study Grp. v. Federal Energy Regulatory Comm.,* —— F.3d ——, ——, 2000 WL 762706, *65 (D.C.Cir.2000) ("We evaluate agency compliance with NEPA under a rule of reason standard.").

In another case cited by the plaintiffs as relevant to this issue, the court rejected a state agency's position that "the uncertainty of development in the . . . area makes the 'secondary' environmental effects of the [project] too speculative for evaluation." [12] *City of Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir.1975). However, this statement was made in the context of reviewing an agency refusal to issue an EIS for a "proposal to build a major interchange in an agricultural area near the edge of urban development, and the purpose of the project [was] to connect a freeway with a road which does not yet exist." *Id.* The agency's suggestion that it was possible that no development would result from the interchange taxed the court's credulity, in light of the purpose of the project and the administrative record. *Id.* A document in the record, prepared by the state and federal highway agencies, had specifically described the area to be accessed by the interchange as one in which local governmental and private entities were planning a research and light industrial development, and as one "about to undergo a rapid change to urban development." *Id.* at 669, n. 8. Moreover, the stated purpose for the interchange was to "provide direct and safe access between the educational, medical, agricultural, and engineering facilities of the University [of California at Davis] and the proposed industrial research center." *Id.*

 It was in the context of these facts and circumstances that the *Davis* court rejected the agency's decision that the "uncertainty of development" made it "too speculative" to evaluate the secondary environmental effects of the interchange project. *Id.* at 676. The plaintiffs here point to a specific portion of the *Davis* court's ruling as support for their contention that the COE should have evaluated environmental effects of secondary development in this case. The court wrote, "[t]hat the exact type of development is not known is not an excuse for failing to file an impact statement at all. Uncertainty about the pace and direction of development merely suggests the need for exploring . . . alternative scenarios based on these external contingencies." *Id.* Again, the two cases are entirely different. It is the facts contained in the administrative record that govern the breadth of the agency's consideration of secondary impacts of a project. The COE is entitled to rely on these facts, as well as its own experience and review of the site and the proposal, to decide that secondary residential and commercial development in the vicinity of the riverboat is not reasonably foreseeable. Unlike the context of a proposed interchange on a major freeway, sited near an urban area, there are no facts in this record that would induce a reasonable person to foresee the type of development suggested by the plaintiffs.

In the interchange context, the purpose of the project was to facilitate access to a previously inaccessible area, and it was reasonable to foresee that such access would lead to development of some type. The agencies themselves admitted that such development had been proposed and was predictable. *City of Davis,* 521 F.2d at 669, n. 8. In contrast, the riverboat casino project's purpose is to provide an attractive resort destination to which peo-

---

**12.** Although the *City of Davis* court applied a standard of review to the agency's decision that is no longer considered correct, that is, the "reasonableness" standard, the Court has additionally considered and distinguished this case on its facts. In 1989, the Supreme Court determined that the appropriate standard of review of an agency decision regarding whether to undertake an EIS is the "arbitrary and capricious" standard, which is more deferential. *Marsh v. Oregon Natural Res. Coun.,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Another case relied on by the plaintiffs is subject to this same weakness. *See Foundation for North Am. Wild Sheep v. United States Dept. of Agric.,* 681 F.2d 1172, 1177 (9th Cir.1982).

ple would travel on existing roads. This does not automatically lead to the conclusion that, once there, they will build homes, retail stores and service stations. Rather, the project's purpose is more consistent with the scenario of people being attracted to the casino for temporary entertainment, and then leaving. This is a reasonable assessment for the District Engineer to make. No facts were presented to the COE that would make this assessment unreasonable, nor were there any making the likelihood of secondary development reasonably foreseeable. Thus, the COE's consideration of the indirect effects of the riverboat project was not arbitrary or capricious.

■ The plaintiffs also point to a USFWS letter that recommends the COE develop an EIS for the project, and reports receiving "extensive biological information" from an Indiana University Southeast biology professor. AR Vol. IX, Tab 85, Letter to Col. Spear dated Jan. 15, 1997. According to USFWS, the "biological information" indicates there is a "high potential for secondary (indirect) impacts on the surrounding ecosystem from additional development which is likely to be spawned by this project." *Id.* The fact that other agencies disagree with the COE's decision about whether to conduct an EIS or to issue a permit does not mean the decision was wrong. *See Akiak Native Community v. United States Postal Service,* 213 F.3d 1140, 1146–47 (9th Cir. 2000); *California Trout v. Schaefer,* 58 F.3d 469, 475 (9th Cir.1995); *Roanoke River Basin Assoc. v. Hudson,* 940 F.2d 58, 64 (4th Cir.1991) (citing *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). NEPA only requires that the COE consider other agencies' concerns, address them, and explain why it found them unpersuasive. *Id.* The COE did consider the USFWS' comments, but found them "contradictory" because in the same letter the USFWS stated that "there would be only minor adverse impacts to resources within their area of expertise." Findings at 69. Col. Spear also noted that

the USFWS kept expressing concern about secondary development and not secondary impacts, and that the COE's concern is with secondary impacts that are foreseeably caused by the grant of a permit. *Id.* Under the circumstances here, the COE found that secondary development was too speculative, (*i.e.* not reasonably foreseeable), to warrant any further consideration.

At no point did the USFWS, or anyone else whose comments are contained in the record, ever explain why Caesars' project is likely to spawn a large amount of future secondary development. Instead, the plaintiffs point to general statements in the record, such as Caesars' response that "the resort will have a dramatic economic impact on southeastern Indiana." Findings at 45. Even taken out of context, this statement does not explain why it would be reasonable to foresee a large amount of secondary development in the area. Considered in context, however, the comment reveals its actual meaning. Caesars explained the statement with reference to the economic impact of its project alone, specifically noting that "a sizable number of job applications have been submitted by residents in Floyd and Harrison Counties." *Id.* This statement implies that the wages from the project will go to Indiana workers, as opposed to those of Kentucky. The fact that the applications were from people who already resided in the affected counties explains why the project was expected to put more money in the pockets of residents of Southeastern Indiana, which presumably would have a "dramatic economic impact" on the area. However, it says nothing about why there would be an increase in residential or commercial development in the area.

The plaintiffs next cite a study performed by the Indiana University Center for Urban Policy and the Environment ("Center for Urban Policy") containing statistics about expected numbers of patrons for the riverboat, the number of jobs that might be created, and various

other projected fiscal and economic impacts. AR, Vol. VIII, Tab 65, Undated Study. It predicted an average annual attendance of 4,371,400 people, generating average annual adjusted gross gaming receipts of $229,488,000.00. *Id.*, Study at 3. The study also projected 2,310 temporary jobs in construction and 3,095 permanent jobs as a result of the casino. *Id.* at 8. As with any economic model, the study conducted by the Center for Urban Policy made its predictions and projections based on certain assumptions. In fact, it cautioned the reader that the revenue estimates "are appropriate for use only in the assessment of riverboat gaming applications." *Id.* at 15, 32. It also stated that the analysis would be accurate as long as the assumptions were fulfilled. *Id.* at 15. Upon review, the Court notes that the study assumed that consumers would spend additional money, rather than "switch their spending to gaming, away from other activities." *Id.* at 16. Other assumptions on which the analysis was based included an assumption that the entire regional impact of the casino would occur in Harrison County, that a certain percentage of the employees for the riverboat would migrate from outside the local area and some would relocate, that those relocating would belong to households like those already existing in the county and distributed as population is already distributed in the county, that spending by local government on new residents would be the same as average spending per existing resident, and that relationships between income, tax rates and tax revenues would stay the same. *Id.* at 16–17. These assumptions do not provide evidence that would make secondary development foreseeable.

Perhaps of more relevance, however, is the study's review of local economic development for the Caesars' project, which noted that Harrison County is located in the Louisville Metropolitan Statistical Area, and it has a "good strong economy, with manufacturing and tourism as key industries." *Id.* at 42. Caesars' site is located adjacent to the Ohio River approxi-

mately eight and one-half miles from the bridge between Louisville and New Albany. *Id.* It is accessible from the interstate system through New Albany. *Id.* As a result, the study found that "riverboat patrons may have little impact on Corydon or Harrison County," as "visitors will have to purposely pursue tourism and business opportunities within Corydon and Harrison County." *Id.* Rather than supporting the plaintiffs' contentions that the District Engineer ignored potential secondary development effects allegedly suggested by this study, it would seem to support the opposite view. The District Engineer's decision to not speculate about secondary development caused by the riverboat is reasonable in light of this study.

 Another indirect effect that the COE allegedly failed to consider, according to the plaintiffs, is the effect of gambling itself, which is not only significant, but also "overwhelmingly negative." Pls.' Brf. in Supp. at 25. Citing a letter from the Kentucky Resources Council, Inc., and one of its attachments, the plaintiffs suggest that the COE must consider the negative social impacts of gambling. AR Vol. X, Tab 101, Letter dated March 19, 1997, Att. 1. The letter refers to the "environmental justice" aspects of the permit at issue, and cites a research survey conducted by the Department of Economics of the University of Illinois, which found that the "social costs of expanded casino gambling" exceed the "consumer benefits from closer proximity to casinos." *Id.*, Abstract. The survey's conclusion is that "casino gambling fails a cost-benefit test." *Id.* Although the COE reply brief makes no mention of this evidence or its significance, the Court notes that the District Engineer specifically stated that he would not "consider whether gambling in Harrison County, Indiana, is desirable." Findings at 46. He then explained that decision by noting

The issue as to whether gambling should be allowed in Harrison County has been decided by the voters and the [Indiana Gaming Commission]. The Indiana

General Assembly legalized riverboat gambling in the State and the passage of the local referendum indicates that a majority of the voting public in Harrison County favors gambling. Consideration of the gambling issue is not within my purview and is beyond the scope of the Corps authority in its evaluation of this permit application.

Findings at 46.

As the Court has already noted, in administering the permit program, the COE "seeks to avoid unnecessary regulatory controls." 33 C.F.R. § 320.1(a)(3). It also strives to reduce paperwork and delays, and "believes that state and federal regulatory programs should complement rather than duplicate one another." *Id.* § 320.1(a)(4), (5). The State of Indiana has made the policy decision that it will permit limited gambling within the confines of the state, and it has established an agency, the Indiana Gaming Commission, to oversee and regulate such activities. COE regulations provide that the "primary responsibility for determining zoning and land use matters rests with the state," and the COE will "normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance." 33 C.F.R. § 320.4(j)(2). Thus, it is reasonable for the District Engineer to defer to the state and local governments on the issue of gambling, as well as the political processes put in place by the Indiana General Assembly for determining the public's acceptance of this type of economic development within a given county.

The plaintiffs have not offered any reason why the Court should find that the COE was required to second-guess the state decision-making process on this issue. No significant issues of overriding national importance have been identified, and the academic survey cited by the Kentucky Resource Council was dated September, 1996. Its contents would have been known to the state and local agencies, the special interest groups, and members of the public who had the opportunity to comment on Caesars' proposal for the riverboat gambling casino well in advance of issuance of the permit. Yet, in light of that study, the state has not reversed its policy decision to allow gambling, and it was reasonable for the COE to rely on state's judgment on this matter. There is simply no evidence that would require the Court to find that the COE's decision regarding the issue of gambling was arbitrary, capricious, or an abuse of discretion.

Finally, the plaintiffs point to comments presented during the public interest review as evidence that the COE ignored significant and negative indirect effects of the project. Those comments include a letter from Earl Becker, chairman of PORE, who cited a transcript from a hearing before the IGC during which it considered whether to extend Caesars' Certificate of Suitability from February to August of 1997. AR Vol. XXV, Tab 234(I), Item 564, Letter dated April 14, 1997. Becker relies on statements made by several commissioners as evidence that Caesars' project "will be used for its intended purpose to create secondary assisted economic development." *Id.* (quotations omitted). He also expressed PORE's belief that the "assisted economic development" would be near the project site, and cited a commissioner who noted that development occurred near the Evansville riverboat and not in the downtown area. *Id.* (citing 2/21/97 IGC Hrg. Trans. at 238). Echoing this concern, one of the board members of PORE, Claude D. Baker, Ph.D., a professor of biology at Indiana University Southeast, wrote to the USFWS of his concern about a "high potential for secondary (indirect) impacts on the surrounding ecosystem from additional development which is likely to be spawned by this project." AR Vol. IX, Tab 85, Letter dated Jan. 15, 1997. Dr. Baker's subsequent biological survey of Knob Creek, located within the proposed development, is cited as further evidence that the development will have significant impacts on the biological resources of this area. AR Vol. XXV, Tab 234(J), Item 576, Letter dated July 1, 1997.

First, with respect to the commissioners' statements, the Court notes that most of the statements were focused on the continued economic viability of Caesars' proposed project, given all of the modifications that had been made in response to environmental concerns. Nevertheless, the IGC agreed to extend Caesars' Certificate of Suitability to August of 1997. AR Vol. XXV, Tab 234(I), Item 564, Hrg. Trans. at 243. Rather than supporting the plaintiffs' claim that the project would foreseeably cause extensive secondary development, the cited text indicates concern on the part of the commissioners about the projects' ability to be profitable. *Id.* at 227–243. Only one comment suggested the possibility of secondary development, but upon careful review, that commissioner appears to have been speculating that the relocation of the golf course some distance from the casino might lead to such development. Specifically, he stated, "Maybe there will be some secondary impact of businesses growing up around that golf course that wouldn't have grown up around there if the golf course wouldn't have been there." *Id.* at 238. This comment alone, without some evidence that a concrete development was being contemplated in that area, will not prove that the COE's decision that secondary development was too speculative to consider was arbitrary, capricious, or an abuse of discretion. For example, if the plaintiffs could have pointed to the sale of property in the vicinity of the golf course, or a petition for a zoning change, or a proposed development, or even a statement by a specific developer that it was interested in the area, they would have been in a better position to challenge the presumed regularity of the COE's decisions.

Second, the biological assessment information supplied to the USFWS by Dr. Baker was presumably considered by that agency when it made its recommendations to the COE during interagency meetings and in letters. The fact that it was also submitted to the COE as part of the record does not change the dynamic that such information fell within the USFWS's area of knowledge, on whose expertise the COE was entitled to rely. *See* 33 C.F.R. § 325.2(a)(3); 33 C.F.R. § 320.4(a)(3); *see also Marsh,* 490 U.S. at 377, 109 S.Ct. 1851 (when analysis of relevant documents requires high level of technical expertise, courts defer to the "informed discretion of responsible federal agencies"). Rather, the COE was entitled to presume that all of Dr. Baker's research and opinions had informed the USFWS when it made its recommendations regarding project modifications and mitigation conditions to impose on the permit. Nevertheless, as a biologist, Dr. Baker was not qualified to express an opinion regarding the likelihood or foreseeability of secondary development that would be caused by the riverboat casino. Thus, it was reasonable for the COE to look elsewhere for evidence of such potential development. That the COE did not see the need to assess potential environmental impacts of secondary development, despite Dr. Baker's warnings, is not arbitrary, capricious or an abuse of discretion.

### 2. Cumulative Effects

Next, the plaintiffs contend that Col. Spear failed to adequately consider the cumulative effects of the riverboat casino project. Cumulative impacts are those that result from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. . . ." 40 C.F.R. § 1508.7. Often they can result from "individually minor but collectively significant actions taking place over a period of time." *Id.* According to the plaintiffs, the duty to discuss such impacts is mandatory and not within agency discretion. Pls.' Brf. in Supp. at 30 (citing *Oregon Natural Res. Coun. v. Marsh,* 52 F.3d 1485, 1492–93 (9th Cir. 1995)). The case cited for this "duty" refers to the discussion of cumulative impacts in an EIS, not in an EA in which the COE has found no significant impact. Yet, because an EA is undertaken to determine whether an EIS is needed, the Court will assume the COE had a similar duty in this context.

In essence, the plaintiffs criticize the COE's analysis of cumulative impacts as being "vague and conclusory." Pls.' Brf. in Supp. at 30–31. In other words, the plaintiffs do not accuse the COE of not considering cumulative impacts, but of not doing it well. Citing extensively from a Fifth Circuit opinion that rejected "the COE's reliance on vague and conclusory assertions," the plaintiffs accuse the COE of preparing "nothing that approximates the required cumulative impact study." *Id.* at 31–32 (citing *Fritiofson v. Alexander*, 772 F.2d 1225, 1245 (5th Cir.1985)). The District Engineer, the plaintiffs argue, should have considered the cumulative impact of this project in the context of both banks of the entire Ohio River, including the Louisville metropolitan area upstream from the project, but his conclusory statements did not reflect such a broad scope of review. *Id.* at 32. According to the plaintiffs, within that scope should have been a consideration of the effect of Caesars' casino when added to all of the other casinos that are currently or will be located along the Ohio River. Finally, the plaintiffs contend that by not properly delineating the scope of his cumulative impacts analysis, or performing a meaningful study of such impacts, the District Engineer abused his discretion and failed to take the requisite "hard look" at such impacts. *Id.* at 33.

The COE counters that the District Engineer considered all of the cumulative impacts that he found relevant to this permit. For instance, the cumulative effects of the other casinos on the river were not consid-ered because they are all at least one hundred river miles away from Caesars' boat. No facts or cases were cited by the plaintiffs that would require the COE to consider the effects of such distant enterprises. In fact, the plaintiffs have not pointed to any facts that would demonstrate that the COE abused its discretion in delineating the scope of cumulative impacts it would consider. *See Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995) (party challenging agency action bears burden of proof). Instead, the plaintiffs accuse the COE of not considering any other actions, past, present or future, that would combine with the casino to cause a significant impact on the human environment. For example, the plaintiffs cite the proximity of extensive development on the Kentucky side of the river that they contend the COE ignored. According to the plaintiffs, instead of meeting this challenge, the COE is merely attempting to shift the burden to the plaintiffs of specifying what other development must be considered in a cumulative impact analysis.

The Supreme Court has specifically stated that "determination of the extent and effect of [cumulative impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718. In reviewing the agency's determination, the court merely considers whether the COE's decision was arbitrary or an abuse of discretion.[13] *Id.* "Even if environmen-

13. The plaintiffs' reliance on the *Fritiofson* case from the Fifth Circuit is ineffective in convincing the Court that the COE erred in its decision regarding these impacts. The cited case has been abrogated by a 1989 Supreme Court decision, which states unequivocally that an agency's decision not to prepare an EIS is reviewable under the highly deferential "arbitrary and capricious" standard, and not the moderately deferential "reasonableness" standard. *Sabine River Auth. v. United States Department of Interior*, 951 F.2d 669, 677 (5th Cir.1992) (citing *Marsh v. Oregon Natural Res. Coun.*, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)); *see also City of Carmel–by–Sea v. United States Dept. of Trans.*, 95 F.3d 892 (9th Cir.1996). The analysis performed by the *Fritiofson* court was driven by its understanding that its task was to "employ the less deferential of the competing standards—the reasonableness test." *Fritiofson*, 772 F.2d at 1237. The court acknowledged that circuits were split on the issue of which standard to use, *Id.*, and that the reasonableness test was "a more rigorous standard ... than the rule of arbitrary and capricious review that ordinarily governs agency actions." *Id.* at 1238. Only by applying this more rigorous test, did the court "weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably conclud-

tal interrelationships could be shown conclusively to extend across [geographic areas], practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." *Id.* In an APA challenge of administrative action, the plaintiffs have the burden of showing exactly how the agency's decision-making was flawed. Rather than meet this burden directly, the plaintiffs here merely question the extent of cumulative impacts considered by the COE, and do not point to any facts in the record that would demonstrate that the COE abused its discretion.

The plaintiffs represent that the COE ignored specific challenges by the EPA and the USFWS to the cumulative impacts analysis. With respect to the EPA letter, the Court has already found that it is not part of the administrative record and should not be considered for purposes of the Court's evaluation of the COE's decisions.[14] Thus, any challenge posed in that letter was not before the COE when it rendered its decisions regarding cumulative impacts. Turning to the USFWS letter cited by the plaintiffs, the Court notes that the USFWS did urge the COE to consider the project in the context of the cumulative impacts of floodplain development. However, the COE reported that on October 16, 1996, November 14, 1996, and March 12, 1997, it met with the USFWS, the Indiana Department of Environmental Management ("IDEM"), the Kentucky Division of Fish and Wildlife ("KDFW"), and Caesars and its agents, to discuss environmental issues. Findings at 4. These interagency meetings considered the impacts to the mussel beds, suitable habitat for the Indiana bat (an endangered species), removal of riparian vegetation, water quality impacts from construction

activities, impacts to the karst areas, wetland impacts, impacts to the forested bluff area, and loss of ephemeral pools. *Id.* The plaintiffs have failed to show that the COE ignored or did not follow the advice and guidance it received from other agencies with technical expertise.

Instead, the plaintiffs have quoted from the District Engineer's summary of the preceding fifty-seven pages of his findings, representing that as proof that the COE's cumulative impact analysis was "vague and conclusory." Pls.' Brf. in Supp. at 31. Specifically, the plaintiffs state, "[i]f these bare conclusions satisfy the District Engineer's legal duty to study cumulative impacts then that duty has no meaning or value at all." *Id.* Upon review of the entire EA, however, the Court is satisfied that it can properly uphold the COE's decision even if it is "of less than ideal clarity," because the "agency's path may reasonably be discerned." *See St. Clair,* 155 F.3d at 850. For example, in the cited letter, the USFWS stated that the "greatest floodplain impact" would be the loss or reduction of ephemeral pools which provide spawning habitat for amphibians. AR Vol. XI, Tab 122, USFWS letter to COE, dated May 16, 1997, at 4. As clear evidence that it was guided by the USFWS's concern, the COE imposed a specific condition on the permit that mitigates this impact and corresponds to proposed mitigation identified by the USFWS. *See* Findings at 70, Condition (j). The Court has found similar evidence of the COE's or applicant's responses to concerns raised by the USFWS and other agencies throughout the record.

The District Engineer summarized the contents and concerns of six letters from

---

ed that the particular project would have no effects which would significantly degrade our environmental quality." *Id.*

**14.** It is troubling that the plaintiffs' brief specifically refers to this letter as being part of the record. Pls.' Reply and Opp. to Cross-Mots. for Sum. J. at 13 ("The record shows, instead, that the United States Environmental

Protection Agency specifically found that the District Engineer should include at least some discussion of cumulative impact of Indiana's Ohio River gambling sites. Pls.App. C.") Whether an oversight or deliberate, the plaintiffs' representation that the EPA letter dated April 15, 1998, was part of the record when it in fact was not, weakens their ability to persuasively present their case to the Court.

the USFWS, including the one cited by the plaintiffs. *See* Findings at 4–7. Specifically, the District Engineer referred to the recommendations made by the USFWS in the May 16, 1997, letter, including the ones relating to mitigating any impacts in the floodplain area. Findings at 6–7 (noting that the USFWS recommended "adding and monitoring breeding ponds and monitoring natural ponds" in the floodplain). The COE noted that the USFWS indicated it did not have sufficient biological justification to recommend permit denial, primarily because of the applicant's willingness to modify the project to address the agency's concerns. *Id.* at 6. Yet, in a letter dated June 11, 1997, the USFWS reserved its right to "elevate" the "individual permit action" to a higher level of review if the COE's permit did not reflect the modifications, agreements, and recommended mitigation conditions described in previous USFWS letters. AR Vol. XI, Tab 128, Letter from USFWS dated June 11, 1997; Findings at 7. No evidence has been presented that the USFWS ever exercised its right to elevate the permit action to a higher level. The fact that it did not supports the inference that the agency considered the COE permit to have addressed its concerns.

Moreover, the COE reported comments from the general public or special interest groups regarding the floodplain impacts, as well as the applicant's responses. Those comments included specific concerns about the area in which the resort hotel, the pavilion, and the parking facilities would be built, noting that it frequently floods. Findings at 30. In response, the applicant stated that the gaming vessel is a "water dependent activity" and as a result its ancillary facilities must be placed as near as possible to the river. *Id.* at 31. Caesars then described the "special aspects of facility design and operating procedures" that would accommodate periods of high waters and minimize impacts, including:

1. the floors of all habitable structures would be located two feet above the elevation of the 100–year flood level;

2. the lower levels of buildings would be supported by columns to allow flood waters to pass underneath without structural damage; and

3. to prevent loss of property or life, an emergency response and evacuation plan had been developed for use when flooding is imminent.

*Id.* In addition, Caesars cited a flood impact analysis conducted to determine the effect of the proposed development on both Knob Creek and the Ohio River flood profiles, which showed no significant impact on flood elevations. *Id.* It also stated that its project would comply with the Water Quality Certification requirement of a "no-net-increase in runoff intensities" by using storm water detention and retention processes and vegetated buffers. *Id.* at 32.

The District Engineer specifically stated that he considered the comments received from state and federal agencies, the written comments received from individuals and statements documented in the public hearing transcript, the project design (including mitigation features and best management practices), meetings and on-site inspections of the proposed work site with state and federal agencies, multi-agency meetings to discuss concerns regarding the proposal, and various reports contained in the file. Findings at 47. All of these elements of the COE's review of the proposed project were undertaken using the special expertise of the District Engineer and members of his staff, to which the Court must defer unless given a reason not to. *See Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. The plaintiffs have pointed to no evidence that would cast doubt on the District Engineer's representations that he considered all of these comments, reports, meetings, documents, and the project itself before reaching his decision that an EIS was not needed and the permit should be granted. Even if a court might not have agreed with the COE, that fact provides no basis to find the agency abused its discre-

tion with regard to cumulative impacts. *See id.*

Further, the Court finds that the EA specifically addressed many of the concerns expressed in the cited USFWS letter. To continue with the floodplain example, the COE stated, with respect to the wildlife impacts, that:

A portion of the riparian corridor along the river will be adversely impacted by the proposed marine facility construction. The small riparian corridor along the river does provide some habitat for small animals and migratory birds. However, it does not have the size, vegetation density and isolation for nesting and rearing purposes. The loss of this riparian corridor results in a minor impact because of its low functional value and the presence of a similar resource within the immediate area.

\* \* \* \* \* \*

The total area of trees to be removed from the site is approximately 5 acres; however, the applicant will plant 10 acres of trees in a fallow agricultural field on site to mitigate the loss. Three (3) shallow ephemeral pools ... would be constructed to enhance wildlife habitat. The pools would be located along woody riparian corridors and away from the roadways.

\* \* \* \* \* \*

The 2–3 foot deep shallow pools would provide feeding sites for frog and salamander adults and larvae. Native shrub species would also be planted to establish a vegetative cover along the channel.

\* \* \* \* \* \*

The 113 acres of upland bluff area would be preserved in its entirety. This area provides habitat for a wide variety of mammals, birds, reptiles, and amphibians, some of which may be state-listed or sensitive species.

Findings at 51–52. The trees to be planted in the mitigation area must be those tolerant to floodplain growing conditions. *Id.* at 70.

Finally, with reference to the USFWS' concern about amphibian life in the floodplain, the COE stated in the "Evaluation and Conclusion" section of the EA that:

To mitigate the ephemeral pools used for amphibian spawning habitat within the project area which will be lost due to construction, the applicant has proposed to create three ponds of approximately 0.25 acre each which will be situated in various locations in the above mentioned tree planting site. In addition to the three ponds which are to be created, I have determined that three additional 0.25 acre ponds shall be constructed in the floodplain away from development to augment the proposed mitigated habitat.... A post-construction plan shall be developed which allows a herpetologist to monitor the amphibian use of all the ponds, newly created and natural, for a period of 5 years. The monitoring plans shall be submitted to the [COE] within 30 days of receipt of a DA permit.

Findings at 60–61. While the COE acknowledged that concerns had been expressed about construction of the proposed project in the floodplain, it noted that the applicant had submitted an analysis regarding impacts on the floodplain to the IDNR, with its application for approval to construct in a floodway. *Id.* at 66.

The State of Indiana is responsible for determining the boundaries of its floodplains and authorizing construction therein. *Id.* After considering Caesars' application for a Certificate of Approval, the IDNR issued the Certificate on August 6, 1997. *Id.* The District Engineer reviewed the IDNR's analysis and found that the 100–year flood height would be only minimally increased by the development. *Id.* In keeping with its regulations, the COE is entitled to rely on the findings and expertise of state agencies. *See* 33 C.F.R. § 320.1(a)(3) (in administering permit program, COE "seeks to avoid unnecessary regulatory controls."); § 320.1(a)(4), (5) (COE strives to reduce paperwork and delays, and "believes that state and federal

regulatory programs should complement rather than duplicate one another."); § 320.1(a)(5) (COE "uses general permits, joint processing procedures, interagency review, coordination, and authority transfers ... to reduce duplication."); § 320.4(j)(4) (unless there are overriding national factors of the public interest to the contrary, a permit will generally be issued following a favorable state determination).

■ The permit issued by the COE contained thirty-four special conditions, and the COE reserved the right to add other conditions after construction began, based on its monthly construction meetings with the applicant. Findings at 67. The USFWS' specific recommendations regarding the impacts on the floodplain included adding "at least 3 more shallow breeding ponds in floodplain areas away from development" and developing a "post-construction plan to allow a herpetologist to monitor amphibian use of these ponds, and of natural ponds in the undisturbed areas, for 5 years." Findings at 70, Cond. (j); AR Vol. XI, Tab 122, May 16, 1997, Letter at 7. This condition reflects the precise recommendation of the USFWS. In addition, the USFWS recommended that the applicant restrict tree clearing, and in tree-planting mitigation areas, that it use only native species appropriate for floodplains. AR Vol. XI, Tab 122 at 6. Conditions (c) and (e) state that "tree clearing shall be minimized ... through the project reach" and "the tree clearing along Knob Creek and its tributaries shall be restricted to only that necessary for stream crossings." Findings at 70. Condition (h) states that "only native species tolerant to floodplain growing conditions shall be planted in the 10–acre mitigation site ... [and] a five-year monitoring plan for the tree planting area shall be submitted ... within 30 days from receipt of [the permit]." Id. As this brief summary demonstrates, the record amply supports a finding that the COE did not ignore the concerns of the USFWS about cumulative impacts in the floodplain, nor did it make decisions that were arbitrary or capricious with respect to any other cumulative impacts of the project.

### 3. Alleged Delayed Consideration of Certain Impacts

The plaintiffs also accuse the COE of arbitrary, capricious and unlawful behavior when it decided to issue the § 404 permit to Caesars while still calling for submission of additional studies about the effects of the cruising schedule on rush hour traffic and the operation of the riverboat on the mussel beds. They argue that the COE used the fact that it can add conditions to an existing permit as an excuse to "delay the required analysis of environmental impacts until after the permit has been issued." Pls.' Brf. in Supp. at 34. Claiming that the riverboat's impact on rush hour traffic and the effect of cruising over part of the mussel bed are important environmental consequences that must be studied before issuing a permit, the plaintiffs assert that the COE's decision to delay consideration of these impacts was arbitrary, capricious and unlawful. Id. In response, the COE maintains that it adequately considered all of the relevant impacts relating to traffic conditions in the vicinity of the riverboat and in relation to the mussel bed, and determined that neither of these effects was significant enough to require an EIS or to deny the permit. Nevertheless, it reserved the right to add mitigating conditions to the permit after a more detailed study of each effect has been completed, or if monitoring of the riverboat's operation would warrant it. See Findings at 60–61.

The real dispute between the parties is the proper characterization of the COE's requirement of additional studies, which the plaintiffs call a "failure to evaluate" certain environmental impacts before issuing a permit, Pls.' Reply Brf. at 14, and the COE explaining it as trying to limit the impacts as much as possible. With respect to the mussel beds, the COE ordered Caesars to "determine the minimum river stage at which propeller scour would im-

pact the downstream portion of the mussel bed." Findings at 62. Once that information was obtained, the COE intended to condition the permit to "prohibit cruising when the river stage is below the established elevation." *Id.* at 62, 71(p). In fact, the condition imposed on the permit prohibited any cruising by the riverboat until a "cruising impact study" is completed and written approval to cruise is granted by the COE. *Id.* at 71(p). Contrary to the plaintiffs' contention, this requirement indicates that the COE was aware of and considered all impacts on the mussel bed by the project's construction and operation. The Court's review of the EA and the permit conditions is consistent with this indication.

Specifically, the COE had already found that less than $\frac{1}{10}$ of one percent of the mussel bed (0.25 acre of approximately a 220 acre bed) would be affected by the riverboat's cruise path. Findings at 51. Citing two quantitative ecological surveys of the mussel bed along the property of the proposed project submitted by Caesars, the COE noted that "there were no live State of Indiana or Federal endangered mussel species found within the bed." *Id.* at 50 (citing surveys located at AR Vol. II, Tab 10 (1995 Survey), Vol. VIII, Tab 70 (1996 Survey)). A third survey was conducted for purposes of IDEM's certification of water quality in August 1997, and it produced findings consistent with the earlier surveys. *Id.* (citing survey located at AR Vol. XIII, Tab 165). The record also contains an independent mussel survey performed for the plaintiffs in October of 1997, which found no live state or federal endangered or rare species. *Id.* (AR Vol. XIII, Tab 167). Because the majority of the mussel bed lies within the boundaries of the Commonwealth of Kentucky, the COE consulted with the Kentucky Department of Fish and Wildlife ("KDFW"). The KDFW wrote that, based on several interagency meetings with the COE and on their own analysis, their opinion was that "there will be little impact to the mussel bed located next to the facility." AR Vol. X, Tab 107

(Letter dated Apr. 4, 1997). However, the KDFW recommended that "some annual monitoring be conducted to document the health of the bed." *Id.* In addition to the propeller scour analysis ordered by the District Engineer, he acknowledged that Caesars' Water Quality Certification contained a condition that required monitoring of the mussel bed for a period of five years. Findings at 62. Thus, a five-year monitoring plan requirement on the § 404 permit was unnecessary. *Id.*

With respect to the cruise schedule's effect on rush hour, the Court notes that the District engineer forwarded the traffic impact information to the Indiana Department of Transportation ("IDOT") for its consideration and analysis. AR Vol. XII, Tab 135, Letter from IDOT dated Apr. 23, 1997. A 1995 traffic study and its supplement convinced IDOT that "no additional capacity [was] needed on any of the roadways that the casino traffic would be using." Findings at 13; AR Vol. XII, Tab 135. Based on the traffic studies in the record, and IDOT's recommendation that no additional capacity was needed, the COE found that the casino would not have a significant impact on traffic in the vicinity of the project. Findings at 66. Although acknowledging that casino traffic would adversely affect those traveling on the roadways on a daily basis, the COE found that effect to be minimal. Highway 111, which passes the casino project, deadends in the Ohio River about sixteen miles downstream from the casino site, and is not a "heavily used throughway to other major highways." *Id.* Improvements were made to Highway 111 at the applicant's expense, and the COE found it to be "adequate to handle the projected volume of traffic." *Id.* However, because Louisville and New Albany "rush hour" traffic could be affected by the casino traffic, the COE ordered Caesars to "provide a detailed analysis to address this issue," which analysis could "result in a modification of the cruise schedule." *Id.* at 66–67. As with the propeller scour analysis, this rush hour traffic study was due to the COE within

thirty days of issuance of the permit. *Id.* at 67; 73(hh).

As noted, the plaintiffs argue that the COE's failure to obtain information about the effect of propeller scour on the mussel bed, and the casino patrons' effect on rush hour traffic in New Albany and Louisville, is unlawful under NEPA. Their theory is that NEPA "rejected the practice of authorizing the destruction of the environment first and then considering the consequences" later, so the COE's issuance of a permit to Caesars without first obtaining information about these "important direct impacts of the proposed project" is "arbitrary, capricious and unlawful." *See* Pls.' Brf. in Supp. at 34. The plaintiffs' burden in this APA challenge is to show that the COE's decision was arbitrary, capricious or an abuse of discretion, and that burden is not satisfied merely by labeling a decision as arbitrary or capricious. The term "arbitrary and capricious" is a "technical legal phrase," meaning "an administrative action not supported by evidence or lacking a rational basis." *Nor–Am Agric. Prods., Inc. v. Hardin,* 435 F.2d 1133, 1145 (7th Cir.), *reh'g,* 435 F.2d 1151, *cert. dismissed,* 402 U.S. 935, 91 S.Ct. 1399, 28 L.Ed.2d 870 (1971). For example, to find an action arbitrary and capricious, "a court must be persuaded by concrete evidence, readily available to [the agency] during its decision-making process, that the ... [agency] relied on a materially distorted picture," when making its decision. *Alschuler v. Department of Housing and Urban Development,* 686 F.2d 472, 484 (7th Cir.1982).

Here, the plaintiffs offer no concrete evidence that by requiring the additional analyses, the COE was authorizing the destruction of the environment first before collecting information about the consequences. Such evidence would include a showing that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Assoc. v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The record reflects none of these deficiencies. Based on relevant factors and consistent with the evidence in the record, the COE found that the impact of the casino project on the mussel bed was not significant enough to require an EIS, much less to deny a permit. Findings at 51. Col. Spear specifically found that no construction would occur in the mussel bed, and the riverboat would cruise over only a small portion of the bed. *Id.* at 12, 51. Thus, even if additional study were to establish that propeller scour would have an adverse impact on the mussel bed, based on the evidence in the record that impact could not be considered significant. To prove the COE's decision was arbitrary and capricious, the plaintiffs' task was to point to some evidence in the record that would show that the COE relied on the wrong factors, entirely failed to consider an important factor, or had no rational basis for its decision. They have not accomplished this task.

Instead, the record shows that, out of deference to the concerns raised by the commentators, the COE ordered a specific study of the relationship between the water level and the propeller scour, and prohibited any cruising until the study was completed. The purpose of the study was to establish information needed to impose additional mitigation conditions on the permit. There is no evidence that a delay in obtaining that information would cause any harm to the environment. Nor is there any evidence that would show that the study would reveal a significant impact on the human environment that would require preparation of an EIS, or force the denial of the permit. On the contrary, evidence in the record shows that less than .1% of the entire mussel bed will be affected by the riverboat's cruise path, that no rare or endangered species have been found in the bed, and that it is possible to minimize the

impact on the bed by only cruising when the water level is at a certain height or above. In addition, the Court notes that the COE imposed conditions on the permit that were responsive to every concern raised by either the USFWS, the KDFW, the IDNR or IDEM regarding the water quality and impact on the mussel bed, which certainly reflects an appropriate level of agency review and a rational decision based on input from outside agencies.

■■ The plaintiffs' argument about the rush hour traffic study is even less convincing. They offer no evidence that the COE relied on improper factors when deciding that the impact on traffic would not be significant, or that it ignored an important aspect of the problem. Nor is there even a suggestion that the explanation offered for its decision regarding traffic impacts runs counter to the evidence before the COE, or that it was so implausible that it could not be the result of a difference in view or the product of agency expertise. Instead, the record reflects a rational basis for the COE's decision not to hold up the permit process because of possible rush hour traffic impacts. The information that would be obtained from the rush hour analysis was expressly intended to allow the COE to further condition the permit, if warranted. Acknowledging that rush hour traffic could be impacted by casino traffic, the COE expressed a willingness to modify the cruise schedule if needed. Findings at 73. The Court finds this decision neither arbitrary, capricious, unlawful or an abuse of discretion.

### 4. Floodplain Impacts

■■ In 1977, the President issued an Executive Order regarding management of the nation's floodplains, which specifically requires all federal agencies to "evaluate the potential effects of any actions it may take in a floodplain" and to "consider alternatives to avoid adverse impacts and incompatible development in the floodplains." Ex. Or. 11988, § 2 (May 24, 1977). The COE's own regulations reflect this policy. See 33 C.F.R. § 320.4(*l*) (floodplains possess significant natural values and carry out functions important to the public interest). In compliance with Executive Order 11988, the COE regulations provide that

district engineers, as part of their public interest review, should avoid to the extent practicable, long and short term significant adverse impacts associated with the occupancy and modification of floodplains, as well as the direct and indirect support of floodplain development whenever there is a practicable alternative. For those activities which in the public interest must occur in or impact upon floodplains, the district engineer shall ensure, to the maximum extent practicable, that the impacts of potential flooding on human health, safety, and welfare are minimized, the risks of flood losses are minimized, and, whenever practicable, the natural and beneficial values served by floodplains are restored and preserved.

33 C.F.R. § 320.4(*l*)(2). When the COE is asked to authorize developments in floodplains, it should do so only when there are no practicable alternatives outside the floodplain, and shall consider means for mitigating the impact within the floodplain. *Id.* § 320.4(*l*)(3).

According to the plaintiffs, the COE "conceded that the proposed project would 'completely change the natural rural setting' of an undeveloped floodplain." Pls.' Brf. in Supp. at 35. They quote from a passage in which the District Engineer wrote, "[w]hether or not this change in the area's aesthetics would be adverse is a matter of one's personal opinion." *Id.* (quoting Findings at 49). By this quote, the plaintiffs suggest that the District Engineer was indifferent to floodplain impacts and his duty to consider them. The quoted language, however, and reference to the project completely changing the natural rural setting, are in a section in which the District Engineer was identifying impacts to the aesthetics of the area, and not in connection with his assessment of floodplain impacts. The plaintiffs argue that

the COE "considered complete elimination of [floodplain] values at Bridgeport to be insignificant." Pls.' Reply Brf. at 16. Subsequently, the plaintiffs characterize the District Engineer's decision as "complete disregard for the significant floodplain values" identified in COE regulations. *Id.* Although they acknowledge that the hotel was moved out of the floodplain, they object to the fact that the pavilion and parking facilities were not also moved. *Id.*

In response, the COE noted that Indiana law prohibits gambling except on riverboats on Lake Michigan, the Ohio River and Patoka Lake, and that the IDNR had issued a permit to Caesars for construction in a floodway. These facts, according to the COE, affected its assessment of floodplain impacts. According to the COE, the fact that gambling in Indiana is restricted to riverboats and the proposed project is a riverboat casino on the Ohio River, means that Caesars's project is "water dependent." *See Friends of the Earth v. Hintz,* 800 F.2d 822, 832 (9th Cir.1986) (finding log storage facility part of an integrated complex for the export of logs, such that storage unit must be adjacent to ship loading facility and is thus water dependent). The COE is correct. There is no reason to think that Caesars' proposed hotel and pavilion are separate facilities that could be located off-site. Rather, just like the log storage unit in *Hintz,* the riverboat, hotel, pavilion and parking form an integrated complex for the provision of recreational and entertainment services to the public. As a result, the District Engineer was merely required to ensure "to the maximum extent practicable" that the impacts of flooding would be minimized, and whenever practicable, the "values served by floodplains [would be] restored and preserved." 33 C.F.R. § 320.4(*l*)(2). In light of the project modifications, these concerns were addressed by the COE.

■ Likewise, the COE is correct that it was entitled to rely on the findings and certifications of various state agencies charged with regulating the relevant activity, as long as there were no significant issues of overriding national importance. *See* 33 C.F.R. § 320.4(j)(2) (noting that state and local governments have primary responsibility for determining zoning and land use matters, and the COE "normally accepts decisions by such governments on those matters"). The types of issues considered to be of overriding national importance include, but are not limited to, national security, navigation, national economic development, water quality, preservation of special aquatic areas with significant interstate importance, and national energy needs. *Id.* As the COE pointed out, the IDNR will not issue a permit for construction in a floodplain unless the applicant

has clearly proven that the structure, obstruction, deposit or excavation will not . . .

(1) Adversely affect the efficiency of or unduly restrict the capacity of the floodway;

(2) Constitute an unreasonable hazard to the safety of life or property;

(3) Result in unreasonably detrimental effects upon fish, wildlife, or botanical resources.

Ind.Code § 14–28–1–22(e). In addition, the IDNR director, before issuing a permit, must "consider the cumulative effects of the structure, obstruction, deposit, or excavation." *Id.* § 14–28–1–22(f). These state law standards mirror those of Executive Order 11988 and the COE regulations. As a result, there is no apparent reason for the COE to duplicate the IDNR efforts, and it was not arbitrary and capricious to give controlling weight to the IDNR findings regarding floodplain impacts.

■ At no point do the plaintiffs indicate, with citations to record evidence, what practicable alternatives existed that the COE ignored, or what significant issues of overriding national importance would invalidate the COE's reliance on the findings of the IDNR. Instead, they point to unrelated statements from the aesthetic

impact portion of the EA and public interest review, and suggest that is all the more consideration the District Engineer gave to floodplain values. Not only does this strategy misrepresent the record, it also does little to meet the plaintiffs' burden in challenging the COE's decision to allow Caesars to place some of its land side facilities in a floodplain. The EA reflects comments from the IDNR about the proposed project occurring in a "physically diverse region of the state ... [with] numerous ecological features." Findings at 12 (citing AR Vol. XII, Tab 141, Letter dated May 16, 1997). The COE specifically referred to the IDNR's opinion "that the project has been modified to reduce the scope of impacts to fish, wildlife, and botanical resources...." *Id.* Also noted is the fact that the IDNR issued its approval for construction in a floodway on August 6, 1997, with all the findings that approval entails. Findings at 13, 66. Nevertheless, the COE acknowledged that the proposed project represented a complete change in land use of approximately 120 acres of land which had been used as a cattle farm. Findings at 47.

Despite this change, however, the COE observed many ways in which the adverse impacts would be minimized: ensuring that no construction would occur in the jurisdictional wetlands (approximately one acre); limiting the amount of tree clearing that may occur, with replacement of trees as much as possible and the planting of ten acres of trees in a fallow field to mitigate the loss of five acres of trees; using only trees that are tolerant to floodplain planting, and monitoring the mitigation area for five years to determine its success; bridging Knob Creek to minimize stream impacts instead of using culverts; creating six shallow ephemeral pools to enhance wildlife habitat; planting native wetland species around the pools; mitigating a small tributary stream along with planting native shrub species for a vegetative cover for the stream; leaving 113 acres of upland bluffs intact and protecting it with a conservation easement; eliminating the placement of utility corridors (gas, water, power lines) in the bluff area; limiting any tree clearing activities to the season when bats are hibernating in caves; minimizing tree cutting along the Ohio River shoreline, with branches being trimmed rather than trees being cut; placing a minimum twenty-five foot vegetative buffer along Knob Creek, with "do not disturb" signs posted in the forested areas; forbidding any in-channel disturbances on Knob Creek without an additional permit; routing any storm water runoff from the parking lots into a retention area, where it will be treated to separate oil, grease and sand from the water before it is discharged into the creek; using erosion control methods during all construction activities; after construction is completed, revegetating all disturbed areas with a mixture of grasses, legumes and native shrubs and hardwood trees; and preserving woodlots and karst areas in the vicinity of the proposed golf course, including the filtering of any drainage that may contain sediment, herbicides, pesticides, and fertilizers. Findings at 59–66. In addition, the applicant had submitted an acceptable emergency/disaster plan, which included a flood emergency plan, which became a condition of the permit. Findings at 62, 71. Finally, the District Engineer reviewed the floodway analysis that was submitted to the IDNR before it issued a certificate for construction in the floodway, and found that the 100–year flood height would only be minimally increased by the proposed project. Findings at 66; AR Vol. V, Tab 49 (Floodway Analysis), Vol. XII, Tab 150 (IDNR Certificate of Approval dated Aug. 6, 1997).

In the face of these findings, the plaintiffs still accuse the COE of a complete disregard for protected floodplain values. They argue that the COE improperly failed to consider moving the pavilion and parking facilities from the floodplain, without indicating any evidence that such an alternative would be practicable in light of the water-dependence of the project. Instead, they merely claim, without explaining, that the pavilion and parking facilities are not water dependent. Nor do they explain how requiring mass transit from

New Albany would be both a practicable and feasible alternative to parking facilities on site. These accusations overlook the fact that the project was modified extensively, as noted above, to reduce impacts in the floodplain. Moreover, some of the other land side structures were moved from the floodplain. For example, both the hotel and the parking garage were moved from the east side of Knob Creek (floodplain) to the west (non-floodplain), and the golf course was moved off-site. Findings at 54. In response to public comments about impacts on the floodplain, Caesars summarized the steps it had taken to minimize the possible impacts due to flooding. Findings at 31. Those steps include ensuring that the lowest floors of all facilities in the floodplain are located two feet above the elevation of the 100–year flood level; supporting the lower levels of buildings with columns to allow flood waters to pass underneath without causing structural damage; and designing an emergency response plan for when flooding is imminent. *Id.* In addition, Caesars noted that a flood impact analysis was conducted on the proposed project and it showed no significant impact on flood elevations due to its placement in the floodplain. *Id.*

From the Court's review of the record, the parties' briefs, the COE's Findings, and the relevant regulations, it cannot find that the COE's decision to allow the construction of some of Caesars's land side facilities in a floodplain was arbitrary, capricious or unlawful. Instead, it was a decision grounded in a rational review of the impacts and alternatives, and reflected reasonable mitigation steps. No evidence in the record has been cited that would render the COE's decision irrational or unlawful.

### 5. Ozone Impacts

According to the plaintiffs, the COE's evaluation of the significance of the proposed project's impact on ozone levels was arbitrary, capricious and contrary to law. In other words, the plaintiffs contend that the District Engineer should have identified and considered the amount of ozone [15] that would be caused by the project, the "significant" health impacts that could result from that amount of ozone, and alternatives that might reduce such ozone impacts. Pls.' Brf. in Supp. at 39. Pointing to comments by the Air Pollution Control District ("APCD") of Jefferson County, Kentucky, in which it questioned the adequacy of Caesars' air quality assessments, the plaintiffs accuse the COE of ignoring six specific deficiencies in the assessments it used when making its decision about the ozone impacts of the project.[16] *Id.* (citing AR Vol. XII, Tab 158, Vol. XIII, Tab 166 att. 6, Vol. XIV, Tab 170, Vol. XV, Tab 201). Further, the plaintiffs identify public comments in the record that express

---

15. "Ozone is formed when hydrocarbons (HC) and nitrogen oxides (Nox), which are pollutants directly emitted from motor vehicle use, react photochemically with sunlight." AR Vol. X, Tab 116, May 1997 Air Quality Analysis at 7. As such, it is not monitored by means of a project-specific review, as is the case with pollutants emitted directly from a vehicle. Rather, "[o]zone planning is based on the development of current emission inventories from various categories of sources (industrial, mobile and area) and projections of these inventories into future years using economic projections, assumptions about upcoming control programs, and other available tools." AR Vol. XIII, Tab 162, Letter from IDEM dated Sept. 26, 1997.

16. Actually the alleged deficiencies were identified in the December 17, 1997, letter from the APCD, and they include the claims that 1) Caesars underestimated the amount of traffic that would be drawn to the riverboat; 2) Caesars' traffic assumptions were not based on any standard reference methods and appear randomly selected; 3) certain methodologies used by Caesars are unsubstantiated; 4) there is no evaluation of the impact of the project on the formation of ozone; 5) Caesars did not assess the traffic and air quality impacts from "developments that are certain to locate near to and as a result of the casino;" and 6) IDOT and IDEM erroneously concluded that the casino project is not a regionally significant project that would require an analysis for conformity with state implementation plans. AR Vol. XV, Tab 201, Letter from APCD dated December 17, 1997.

serious concern about ozone impacts, as well as a letter from the EPA in which it suggested that in light of the project's proximity to the Louisville ozone nonattainment area, "its air pollution impacts should be carefully evaluated." AR Vol. XXIX, Tab 234M, Item 777, EPA Letter dated Jan. 9, 1998.[17]

In response, the COE contends that its consideration of ozone impacts of the project was adequate, given that those potential impacts were taken into account in the region's air quality plan, which complies with the Clean Air Act ("CAA"). COE's Brf. in Supp. of Sum. J. at 54. With reference to the CAA's framework, the COE notes that the EPA has established National Ambient Air Quality Standards ("NAAQS") for certain air pollutants, including ozone, that it finds necessary to protect the health and welfare of the public. Id. (citing 42 U.S.C. § 7409). State Implementation Plans ("SIPs") are prepared by each state to specify the emission limitations and other measures necessary for the state to attain and maintain the NAAQS for relevant pollutants in each air quality control region of the state. 42 U.S.C. § 7410. If an air quality control region is considered nonattainment for a certain pollutant, such as ozone, no agency of the federal government shall permit or approve "any activity which does not conform to an implementation plan." 42 U.S.C. § 7506(c)(1). Jefferson County in Kentucky, and Clark and Floyd Counties in Indiana, are part of a five-county moderate nonattainment area for ozone. AR Vol. X, Tab 116.

All five counties fall within the jurisdiction of the Kentuckiana Regional Planning and Development Agency ("KIPDA"), which is the metropolitan planning organization ("MPO") designated for the urbanized area of Louisville, Kentucky, under federal transportation laws. See 23 U.S.C. § 134(b). The purpose of an MPO is to "develop transportation plans and pro-

grams for urbanized areas of the State," that will meet the objective of encouraging and promoting safe and efficient management, operation and development of surface transportation systems and foster economic growth and development. Id. § 134(a). To accomplish this purpose, an MPO must develop transportation improvement plans and programs in cooperation with the State, and update them once every two years. 49 U.S.C. § 5304(a). This planning process requires consideration of seven specifically-identified factors. 23 U.S.C. § 134(f). Those factors include the economic vitality of the metropolitan area, safety and security of the transportation system, increased accessibility and mobility options, *protecting and enhancing the environment* (including promoting energy conservation and improving the quality of life), enhancing the integration of transportation systems, promoting efficient system management and operation, and preservation of the existing transportation system. Id.

When an MPO's regional area is designated as nonattainment under the CAA for ozone or carbon monoxide, the MPO must develop long range plans that are in conformity with the SIPs for the relevant states. 23 U.S.C. § 134(g)(3). In other words, the plans must conform with the SIP's "purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards." 42 U.S.C. § 7506(c)(1)(A). Conformity also means that the planned activities will not "cause or contribute to any new violation of any standard," increase any existing violation, or delay timely attainment for the area. Id. § 7506(c)(1)(B). KIPDA, as MPO for the Louisville metropolitan area, prepared the 1996 update to its long range transportation plan (the *Horizon 2020 Regional Mobility Plan* ) with an accounting for the travel impacts of the riverboat casino development in Harrison County. AR Vol. X, Tab 116, "Air Quality Assessment" at 8.

**17.** The Court was unable to locate this letter in Vol. XXIX of the AR, but will assume that such a document exists and was made a part of the record, given that the COE did not dispute its existence.

In its report, KIPDA specifically stated that an "air quality conformity analysis was conducted as part of the plan update." *Id.* The plan update determined that the "spirit" of the SIPs was being met, and the plan thus conformed to the SIPs.[18] *Id.*

In its findings, the COE specifically referred to the KIPDA determination regarding conformity with the SIPs, stating that vehicle access to the proposed project is in an air quality area that requires transportation control measures due to moderate nonattainment for ozone. Findings at 49. The plaintiffs contend that the District Engineer blindly accepted the air quality assessment of Caesars' consultant and did not independently verify its contents before finding the air quality impact insignificant. They also question the reliability of the KIPDA report, and imply that it does not exist because it was not made a part of the record. Pls.' Reply Brf. at 17. Further, they suggest the report may not have been accurately quoted by the consultant, and argue there is no basis for concluding that the report was intended to support the conclusion for which the COE cited it. *Id.* The plaintiffs also accuse the District Engineer of completely disregarding the views of the APCD of Jefferson County, which criticized the air quality analyses submitted by Caesars.

The Court cannot agree with the plaintiffs' opinion about the COE's assessment of ozone impacts. First, it is clear that this issue drew a great deal of comments and controversy during the administrative review process, which means it was reviewed as part of the EA process. Second, there are several references to KIPDA's 1996 Plan Update in documents other than Presnell's report, which supports its existence and reliability. Third, the evidence the plaintiffs offer to show that the report may have been misrepresented is taken out of context and does not appear to be intended for the use to which the plaintiffs have put it. Finally, the APCD's criticisms were echoed initially in IDEM's letters and later were dropped, which shows it was not arbitrary or capricious for the COE to find that they were properly addressed by Caesars.

The Court has carefully reviewed numerous documents from the record about this issue, and finds that the COE considered all of the relevant issues that were raised and made a supportable decision based on that consideration. Although the COE's decision regarding this impact is "of less than ideal clarity," the Court has been able to discern the reasons for it, and therefore will uphold it.[19] *See St. Clair,* 155 F.3d at 850.

18. The COE has suggested that KIPDA's plan update must receive federal approval because of the area being nonattainment for ozone, but cited three provisions in the transportation statutes that do not support such a requirement. Section 101(a) of Title 23, contains the definitions to be used in the chapter, including that "secretary" means the Secretary of Transportation. Section 105(a) calls for state highway departments that want to obtain federal funds for their highway projects to submit their programs for use of those funds to the Secretary (of Transportation) for approval. 23 U.S.C. § 105(a). After a program has been approved, the state highway department must submit any requested surveys, plans, specifications and estimates for each project to the Secretary for approval. 23 U.S.C. § 106(a). It is puzzling how these statutes could prompt the COE to contend that an MPO's plan for projects in nonattainment areas must be submitted to the federal government for a determination of their con-

formity with the applicable SIP. *See* COE Mem. in Supp. of Mot. for Sum. J. at 55. As this point is not crucial to the outcome of the Court's analysis, it only requires that the COE's attention be drawn to the mistake.

19. The COE is cautioned, however, to make a greater effort in the future to specifically address the issues surrounding a specific challenge to the factual basis for its decisions. Although the Court was able to perceive from the record the reasons the COE resolved the controversy about the traffic studies and air quality analyses in favor of granting the permit, it would have been of great assistance to the Court if the COE had been more explicit. Instead of merely referring to documents in the record, the COE could have specifically summarized the facts from those documents that persuaded it to resolve the dispute in favor of the applicant. *See Van Abbema v. Fornell,* 807 F.2d 633 (7th Cir.1986). In fact, this might have been one of those instances

■ With respect to the District Engineer's alleged "blind acceptance" of the two air quality analyses prepared by Presnell Associates, Inc. ("Presnell"), which concluded that "air quality standards would not be substantially impacted," Findings at 48, the plaintiffs challenge the factual basis for this conclusion. The COE quoted from the conclusion of the May 1997 air quality analysis, which stated that "[i]t has been documented that traffic generated by the project has been included in the *"Horizon 2020 Regional Mobility Plan"* and that the plan is consistent with State Implementation Plans." Findings at 49. The District Engineer also noted that a second air quality analysis was performed in November 1997, which doubled the projected traffic and still found that air quality would not be adversely impacted. *See* AR Vol. XIV, Tab 192. It is apparent that the COE relied on these analyses when making its determination regarding air quality impacts. Both of the air quality analyses were performed by a consultant hired by Caesars, but the COE is entitled to use such reports when reaching a decision unless it has received "particularized objections to material upon which it importantly relied in its review." *Van Abbema,* 807 F.2d at 640.

Relying extensively on the *Van Abbema* decision, the plaintiffs claim that specific challenges to these air quality analyses were made by members of the public and by the APCD, and that the COE ignored them and relied instead on the consultant's conclusions. For example, they point to several letters from the APCD, in which that agency told the COE that Presnell's May 1997 analysis was "insufficient," and listed the information needed to make it adequate. AR Vol. XII, Tab 158, Letter from APCD dated Sept. 3, 1997; Vol. XIII, Tab 166, Letter from APCD dated Sept.

30, 1997; Vol. XIV, Tab 179, Letter from APCD dated Nov. 14, 1997; Vol. XIV, Tab 183, Letter from APCD dated Nov. 19, 1997. Primarily the APCD's objection was that the assessment was based on an inadequate traffic study. AR Vol. XII, Tab 158. The APCD believed that Caesars' traffic projections underestimated the traffic that would be drawn to the boat and its ancillary facilities. *Id.* In a subsequent letter, the APCD acknowledged a meeting with Presnell and some of Caesars' employees regarding the air quality analyses, and expressed its understanding that Caesars would address the air pollution agency's continuing concerns. AR Vol. XIII, Tab 166, Att. 6, Letter from APCD dated Sept. 30, 1997.

Scattered among the COE's Findings are references to the communications relating to this issue. Referring to a December 1995 traffic study submitted by the applicant, the District Engineer stated that his staff forwarded the study to IDOT in early 1997, "requesting information regarding traffic studies or analyses IDOT had conducted with respect to the existing road system ... leading to the proposed casino site." Findings at 13. In a June 24, 1997, letter, IDOT stated that it had reviewed a Supplemental Traffic Study and the original one (from December 1995), and that "no additional capacity is needed on any of the roadways that the casino traffic would be using." Findings at 13; AR Vol. XIII, Tab 162. This evidence suggests that IDOT found no inconsistencies between its own traffic studies and Presnell's. However, the COE acknowledges a November 1997 letter from the APCD, expressing concern about the ozone nonattainment area surrounding Louisville, and stating that because it had not yet received all of the information re-

when "there was such a failure to explain agency action as to frustrate effective judicial review," requiring affidavits or testimony from the agency with "such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d

106. Nevertheless, the lack of explicit resolution of the dispute in the COE's Findings in this case did not seriously hinder the Court from reviewing the COE's decision regarding air quality impacts, it merely complicated it unnecessarily.

quested from Caesars, its position was that "there exists an inadequate and incomplete understanding and evaluation of the potential air quality impacts from the proposed project." Findings at 13–14; AR Vol. XIV, Tab 179, Letter from APCD dated Nov. 14, 1997. The COE further noted a letter sent by Caesars in response to this November letter, in which Caesars replied to the APCD's concerns and stated that it was in the process of obtaining additional data with which to run CAL3QHC Models [20] again. *Id.* at 14; AR Vol. XIV, Tab 187.

Following these references into the record, the Court has discovered an entire series of letters between the APCD, IDEM, the COE, and Caesars, culminating in the APCD board notifying the COE in December of 1997 that it was formally requesting that an EIS be conducted. Upon careful review, it is obvious that Caesars responded to each of the APCD's concerns to the satisfaction of IDEM and the COE, but not to the satisfaction of the APCD. For example, a primary concern expressed by the APCD was the reliability of Caesars' submitted traffic studies, and in a letter from IDEM dated September 26, 1997, the Indiana agency raised similar concerns. AR Vol. XIII, Tab 162. After reviewing the 1995 Presnell Traffic Study, the May 1997 Presnell Air Quality Analysis, an undated traffic study for Harco Entertainment, Inc., prepared by R.W. Armstrong, an April 1995 Transportation Impact Study for the Evansville boat, KIPDA's January 1996 Travel Demand Forecasting Model, Final Report, a description of the road improvements made by Caesars, and numerous letters, memoranda from agencies, and citizens' comments, IDEM spotted only three issues. *Id.*

First, the IDEM wanted further explanation about the assumptions made regarding "holdovers" (casino patrons who stay on the boat for a second or third cruise), peak traffic flow, and directional split. Next, it wanted clarification regarding the number of traffic studies completed for this project, the purpose of each, and the methodology used, and finally, IDEM questioned whether the scope of the project had changed. AR Vol. XIII, Tab 162 at 3. Noting that the air quality analyses were based on traffic projections, IDEM suggested that changes in the traffic studies may affect the air quality analysis. *Id.* Yet, IDEM's letter also acknowledged that "staff of the IDOT have reviewed much of this information and, after their questions were answered, generally found the studies to be acceptable." *Id.* It also referred specifically to a consultation with KIPDA and stated that "KIPDA ... has included assumptions about this development in its future year projections and also concluded that roadway improvements are not necessary." *Id.*

In response to APCD's and IDEM's concerns, Caesars sent a letter to the COE that contained a copy of a letter to IDEM dated October 15, 1997, which answered IDEM's questions and addressed its concerns. AR Vol. XIII, Tab 166, Letter from Caesars dated Oct. 24, 1997. The letter to IDEM referenced a meeting between Caesars and IDEM staff members, and it explained that the "factoring of 'holdovers' from previous cruises and peak traffic flows was based on actual data from the Indiana Gaming Commission (IGC)." *Id.*, Letter from Caesars dated Oct. 15, 1997. According to Caesars, the IGC's data shows that 85–100% of casino patrons are holdovers, but Caesars' initial traffic projections only used a 40% rate. *Id.* It has been changed to a 60% holdover factor, which is still conservative by the industry standards recorded by the IGC. *Id.* Further, Caesars explained that it had conducted three traffic studies, December 1995, July 1996 and November 1996, and

---

**20.** A CAL3QHC Model is a micro-computerized model that simulates the dispersion rate of various pollutants. AR Vol. XIV, Tab 192 at 2. It was developed to predict the level of carbon monoxide or other inert pollutant concentrations from motor vehicles traveling near roadway intersections. *Id.*

described the purpose of each and the methodology used.[21] *Id.*

In fact, Caesars specifically cleared up a point of confusion that had caused IDEM to infer that a 20% increase in traffic was indicated by the more recent studies. Apparently, the first study projected only the number of additional vehicles per hour (vph) that would be generated by the casino, whereas subsequent studies added that number to the existing traffic of 147 vph, making their projections appear higher than the original study. *Id.* Caesars also stated that the scope of the project had not changed, as there were still only 3,750 "gaming positions" on the riverboat. *Id.* The apparent confusion had been caused by the difference between the number of gaming positions and the actual capacity for the riverboat, which Caesars estimates would be determined to be 5,000 people. *Id.* In addition to responding to the concerns IDEM raised, Caesars' October 15, 1997, letter also addressed APCD's concerns expressed in a letter dated September 30, 1997, that APCD had sent to Presnell. AR Vol. XIII, Tab 166.

It was after the COE received Caesars' letter of explanation to IDEM that the APCD sent its November 14, 1997, letter to the COE stating that Caesars had not provided the agency with the information it had requested and, consequently, it was taking the position that the air quality analyses produced for Caesars were inadequate and incomplete. AR Vol. XIV, Tab 179. The APCD notified Caesars of this on November 19, 1997, in a letter acknowledging a recent meeting between the two on November 7, 1997, and summarizing the status of Caesars' responses to date. AR Vol. XIV, Tab 183. In response, Caesars again provided an explanation about the holdover rate, the traffic discrepancies between its projections and those for the Aztar boat, and also furnished specific documents the APCD had requested. AR Vol. XIV, Tab 187, Letter from Caesars

dated Nov. 25, 1997. In addition, Caesars asked for another meeting with the APCD staff after the new air quality analysis was completed by Presnell, which was expected at the end of November. *Id.* Rather than meet with Caesars, the APCD sent its letter to the COE requesting an EIS.

In the meantime, IDEM had communicated with members of POW and PORE, and defended the position it had taken with respect to the casino project—that the project would not be significant enough to require a conformity determination. AR Vol. XIV, Tab 195, Letter from IDEM dated Dec. 4, 1997. Copies of these letters were sent to the District Engineer are included in the administrative record. Although IDEM stated it would like to have some additional information regarding traffic generation, it indicated that it would work with Caesars to develop and evaluate such information in the future. *Id.* "IDEM's technical review of this issue also concluded that the direct and indirect emissions from the project ... would not likely exceed the 'regionally significant' levels established in [the federal regulations]." *Id.* Finally, in its letter to a PORE member, IDEM stated that "[r]easonable people will likely disagree about the potential impacts of this project and whether additional roadway capacity will be required." *Id.* No subsequent letters, comments or requests from IDEM appear in the record. A reasonable inference from this is that IDEM was satisfied with the information provided after its last request.

In contrast, the next letter from the APCD came from the vice-chairman of its Board, Linda B. Morton, in which she informed the COE that the Board had adopted a motion to request the COE to undertake an EIS of the casino project. AR Vol. XV, Tab 201, Letter from APCD dated Dec. 17, 1997. The letter stated that "despite substantial efforts to develop

---

**21.** As an attachment to its letter to the COE, Caesars included a traffic summary that described in detail the methodology used for

determining the average number of vehicles that would be on the road per hour of operation. AR Vol. XIII, Tab 166.

an adequate evaluation of this project's air quality impacts, we now conclude that no adequate evaluation or assessment ... has been done by Caesars and that numerous deficiencies exist in assessing the project's air quality impacts." *Id.* at 2. Morton proceeded to criticize the assessments made by Caesars of the traffic to be caused by the project, which she contended underestimates the amount. *Id.* She also stated that assumptions were made "without sufficient justification," and that some of Caesars' methodologies were "unsubstantiated." *Id.* The APCD accused Caesars of making no assessment of the impacts of the project on the formation of ozone, or of the impacts "from developments that are certain to locate near to and as a result of the casino," such as restaurants, gas stations, and retail stores. *Id.* Finally, the letter asserted that IDEM and IDOT reached erroneous conclusions about the project not being regionally significant under the CAA. *Id.*

Caesars sent a letter to the COE dated December 29, 1997, rebutting with great specificity the allegations in the APCD Board's letter. AR Vol. XV, Tab 210, Letter from Caesars dated Dec. 29, 1997. In it, Caesars pointed out that its traffic projections were prepared based on actual traffic data reported by existing Ohio River casino operators to the IGC. *Id.* It also addressed the APCD's concerns over the methodologies, assumptions, and analysis of ozone formation, as well as the related analysis by KIPDA, on which Caesars' consultant relied. *Id.* Caesars defended the findings of the Indiana agencies, and pointed out that the APCD is not the MPO for the Louisville metropolitan area, KIPDA is. Caesars has raised a relevant point. All three of the state and regional agencies charged with responsibility for monitoring transportation and air quality issues—IDEM, IDOT, and KIPDA—have reviewed the project and found that it does not exceed the allowable standards in their areas of expertise.

■ As IDEM explained to POW member Sarah Frey, "IDEM's air quality planning efforts in ozone nonattainment areas are not based on project specific reviews. Ozone planning is based on development of current emission inventories from various categories of sources ... and projections of these inventories into future years using economic projections, assumptions about upcoming control programs, and other available tools." AR Vol. XIII, Tab 162, Letter from IDEM dated Sept. 26, 1997. Given that ozone is formed by the photochemical interaction between certain emissions from motor vehicles and sunlight, and is not directly emitted from any source, it makes sense that a more complicated process is needed to predict ozone levels in the environment. *See* AR Vol. X, Tab 116, May 1997 Air Quality Analysis at 7. Ozone cannot be measured from a specific source, but is extrapolated from knowledge about all possible sources of the emissions that interact with the sunlight, using various scientific methodologies. For purpose of this analysis, however, the Court is satisfied that it was not arbitrary or capricious for the COE to give greater weight to the opinions of IDEM and KIPDA, the agencies that are responsible for air quality planning in connection with an ozone nonattainment area, such as Louisville, than to a local air pollution control district, whose task it is to guard against any worsening of the air quality in its specific area. The APCD's focus, understandably, is on measuring specific local emissions, whereas KIPDA and IDEM focus more on regional impacts in the aggregate. From the Court's review of the materials in the record, it is obvious that this distinction influenced the COE's decision regarding the air quality impacts of the project.

■ In a further effort to specifically challenge important information on which the COE relied in reaching its decision, the plaintiffs cite "evidence that the authors of the [KIPDA] report did not intend to express any view at all on the environmental significance of ozone impacts resulting from the casino project." Pls.' Brf. in

Supp. at 39 (citing AR Vol. XXVII, Tab 234K, item 592). The cited document is a memorandum from Jack L. Scriber ("Scriber"), the Executive Director of KIPDA, to its Transportation Policy Committee ("TPC"), and it was attached to a letter from a private citizen to the COE asking why KIPDA would not adopt a resolution requesting an EIS. AR Vol. XXVII, Tab 234K, item 592, Letter from Walter Schultz dated Oct. 9, 1997. Apparently, at the July 24, 1997, meeting of the TPC, the committee was asked to draft a resolution to urge the COE to prepare an EIS, but KIPDA's Executive Director asked the TPC to defer any action until he could "research the practical effects of such a resolution." *Id.,* Memo from Scriber dated Aug. 15, 1997. After reviewing the federal regulations and conferring with federal agency staff, Scriber stated that the decision about whether to perform an EIS was solely up to the COE. "There is no regulatory guidance to suggest that their decision would be influenced by requests or resolutions expressed by individuals or organizations *that are not involved in the process of determining the environmental impacts* of a particular action." *Id.* (emphasis added). Thus, the Executive Director recommended against adopting such a resolution.

The significance of the emphasized statement is not as clear to the Court as it is to the plaintiffs, who take it as an admission that KIPDA was not involved in determining air quality impacts of the casino. First, the Court is not convinced that the quoted statement could be accurately described as coming from the "authors" of KIPDA's final report for the *Horizon 2020 Plan.* There are nine counties affiliated with KIPDA, which suggests it would be unlikely that a report such as the *Horizon 2020 Plan* would have been drafted by its executive director. The greater likelihood is that its content derived from a committee's work. Second, Scriber's statement was not made in the context of explaining the intent or purpose of the 1996 plan update, but in the context of trying to avoid inefficient, or needless, agency ac-

tion, in the opinion of its executive director. Finally, whether Scriber believed that KIPDA was one "involved in the process of determining the environmental impacts" of the COE's action in granting the permit is irrelevant to how the COE would view KIPDA's final report on the 1996 plan update.

From the Court's brief summary of regional transportation planning it is obvious that environmental issues must be considered by KIPDA, whether it considers itself as being involved in such determinations or not. As an MPO, KIPDA's planning process requires consideration of seven specifically-identified factors, including protecting and enhancing the environment. *See* 23 U.S.C. § 134(f). Similarly, when an MPO's regional area is nonattainment for ozone, its plans must conform with the SIP's "purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards." 42 U.S.C. § 7506(c)(1)(A). For all of these reasons, the Court finds that it was not arbitrary, capricious, unreasonable, or an abuse of discretion for the COE to disregard the Scriber memorandum and give greater weight to the KIPDA *Horizon 2020 Plan.*

**6. Necessity of Conducting an EIS**

■ Having reviewed the specific criticisms of the COE's EA, the Court has all of the information it needs to determine whether the COE abused its discretion when it decided not to undertake an EIS for this project. As already mentioned, the purpose of an EA "is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *River Rd. Alliance,* 764 F.2d at 449. The COE decided that there was not. Given the quality of the specific challenges the plaintiffs have made to the separate impacts assessed by the District Engineer in the EA, the Court cannot say that the decision not to undertake a more extensive

EIS was arbitrary, capricious or an abuse of discretion.

■ To set aside an agency decision, a court should be convinced that there are "substantial procedural or substantive reasons as mandated by statute" for doing so. *See Baltimore Gas & Elec. Co.* 462 U.S. at 97, 103 S.Ct. 2246. The principal argument presented by the plaintiffs in support of their contention that an EIS was necessary as a matter of law, is that the EA in this case was so lengthy. Because COE regulations state that an EA is usually no more than fifteen pages, the plaintiffs argue that because this EA is more than seventy, it signals the need for a more comprehensive study of environmental effects. In support of this contention, the plaintiffs cite a 1985 case in which Circuit Judge, now Justice, Steven G. Breyer is quoted as saying that a lengthy EA usually indicates the need for an EIS. *Sierra Club v. Marsh,* 769 F.2d 868, 874 (1st Cir.1985). The case, however, does not stand for the proposition that a lengthy EA means an EIS was needed, as plaintiffs suggest. Rather, the court stated it would not accept either argument—plaintiffs that a lengthy EA signaled that an EIS was needed, or defendant's that it reflected a thorough consideration of potential impacts. Instead, the court decided that because it was clear that local planners saw the construction of the causeway and port on Sears Island as part of an integrated industrial development, an EIS was needed to assess the impacts of this foreseeable secondary development. *Id.* at 881–82. This rationale does not fit the facts of this case, and the court's dicta does not govern the issue of whether the COE abused its discretion by refusing to conduct an EIS.

■ Nor is the Court otherwise convinced that the plaintiffs have identified a substantial procedural or substantive reason to set aside the COE's finding of no significant impact. They point to the size of the project, the size of the record, the intensity of the opposition, and the "unique environmental values" at the site, and argue that compelling evidence exists in the record to warrant this Court ordering the COE to perform an EIS. The Court cannot agree. Rather, the evidence shows that the COE took a hard look at the environmental factors implicated and did not abuse its discretion in refusing to perform an EIS, despite numerous requests to do so. Among the plaintiffs' strongest objections are the fact that other agencies, such as the USFWS, recommended an EIS be performed, and the contention that the COE ignored their advice. These add up to an abuse of discretion, the plaintiffs argue. However, the COE is not required to agree with all of the agencies whose expertise is needed to conduct an EA. *See Roanoke River Basin Assoc.,* 940 F.2d at 64 ( the COE "should consider the comments of other agencies, but it need not defer to them when it disagrees"). It is enough that the COE's findings reflect an awareness and acknowledgment of the other agency's position and offer sufficient guidance about why the COE did not follow its recommendation.

After reviewing all of the plaintiffs' challenges to the specific findings regarding the indirect, cumulative, floodplain, and ozone impacts of the project, the Court is satisfied the COE's finding of no significant impact with respect to each was not arbitrary, capricious, or an abuse of discretion. It would be hard pressed to now decide that the COE abused its discretion in deciding that overall there was not enough likelihood of significant environmental impact to warrant an EIS. The plaintiffs' arguments on this issue were not up to the task.

### D. Analysis of Alternatives

■ Once the COE issues either an EA with a FONSI, or an EIS, it must "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); *Van Abbema,* 807 F.2d at 638. "This requirement is independent of

the question of environmental impact statements, and operative even if the agency finds no significant environmental impact." *River Rd. Alliance,* 764 F.2d at 452. Although the COE has found that the project has a nonsignificant impact, it is possible that an even less harmful alternative exists, and a determination should be made as to whether it would be feasible. *Id.* Nevertheless, "the smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct." *Id.*

■ Consequently, the range of alternatives that must be considered under NEPA when only an EA is needed, is smaller than it is with an EIS. *Mt. Lookout–Mt. Nebo Prop. Protect. Assoc. v. Federal Energy Reg. Comm.,* 143 F.3d 165, 172 (4th Cir.1998); *North Carolina v. Federal Aviation Admin.,* 957 F.2d 1125, 1134 (4th Cir.1992) (citing *Olmstead Cit. for a Better Comm'y v. United States,* 793 F.2d 201, 208 (8th Cir.1986)). In fact, the NEPA regulations themselves highlight this distinction. The regulations governing the format and procedure for preparing an EIS refer to the consideration of alternatives as "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Not only must the EIS present the environmental impacts of a proposal in "comparative form ... sharply defining the issues," it must also "rigorously explore and *objectively* evaluate all reasonable alternatives." *Id.* By contrast, when an EA confirms that the impact of the proposed activity is not significant (*i.e.* a FONSI), the COE need not include any discussion of alternatives if there are no unresolved conflicts about resource use and the activity is water dependent.[22] 33 C.F.R. Pt. 325, App. B(7).

■ Otherwise, if there are "unresolved conflicts concerning alternative uses

of available resources, the EA shall include a discussion of the reasonable alternatives which are to be considered by the ultimate decision-maker." *Id.* The decision-maker's "decision options" include issuing the permit as is, issuing the permit with modifications or conditions, or denying the permit. *Id.* Given that the entire EA and FONSI should be brief, normally not more than fifteen pages, the "discussion of reasonable alternatives" in an EA will be very different from the "rigorous exploration" and "objective evaluation" of all reasonable alternatives required for an EIS. *See River Rd. Alliance,* 764 F.2d at 449. While an EIS is a "detailed report completed after a thorough analysis and study," an EA is a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." *Rhodes,* 153 F.3d at 788 (quoting *Cronin v. United States Dept. of Agric.,* 919 F.2d 439, 443 (7th Cir.1990)).

■ With respect to the consideration of alternatives, the COE is also required by regulations implementing the CWA to "examine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S.[,] or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. § 230.5(c); *see also* 40 C.F.R. § 230.10(a) (no discharge of dredged or fill material allowed if there is a practicable alternative that would have less adverse impact on aquatic ecosystem). To be considered "practicable" an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). It is obvious that before an

---

22. An activity is "water dependent" when it requires access or proximity to or siting within a "special aquatic site" to fulfill its basic purpose. 40 C.F.R. § 230.10(a)(3). The Court has found that Caesars' project was water dependent. The parties have not even suggested the absence of unresolved conflicts concerning alternative uses of available resources, but have acted instead as if such conflicts exist. That element appears to have been met.

alternative can be considered practicable, there must first be a clear idea of the overall project purposes. *See Simmons v. United States Army Corps of Eng.*, 120 F.3d 664, 668 (7th Cir.1997). "[E]very time an agency prepares an environmental impact statement, it must answer three questions in order. First, what is the purpose of the proposed project (major federal action)? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular reasonable alternative?" *Id.* The court owes deference to these decisions the agency must make, for "it is not our role to second-guess" the COE. *Id.* at 669.

In *Van Abbema*, the Seventh Circuit wrote "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the *general goal* of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." [23] 807 F.2d at 638 (emphasis in original). The applicant in *Van Abbema* was seeking a permit to build a coal transloading facility along the Illinois banks of the Mississippi River, that would facilitate the delivery of coal from a nearby mine via trucks to the transloading facility and onto barges to be delivered to a public utility in Iowa. *Id* at 635. The Seventh Circuit framed the general goal of the action broadly as, "deliver[ing] coal from mine to utility." *Id.* at 638. With that purpose in mind, the court then criticized the COE's suggestion that an alternative may not be feasible "at least partly because the applicant does not own

the necessary land or perhaps cannot gain access to it." *Id.* Finding other nearby alternatives for moving coal from mine to utility, the court turned to a consideration of the COE's evaluation of those alternatives. *Id.* at 639. Because the COE relied on obviously flawed economic data in performing that evaluation, the *Van Abbema* court vacated the permit and remanded to the COE for further evaluation. *Id.* at 643.

Here, the COE wrote that the "Purpose and Need for the Project" was "to construct a permanent mooring facility for the *operation of a riverboat casino* and amenities including a hotel, shoreside facility, golf academy, golf course, and parking areas." Findings at 1 (emphasis added). In other words, the purpose was to develop a site for the placement of a highly-regulated activity, that is, an activity that is prohibited by state law from occurring anywhere but where the state gaming commission allows it to be. It was also to develop the riverboat and its amenities. The COE further found that the work was "needed *to obtain a State license* to operate one of five (5) riverboat casinos, on the Ohio River, at specified sites." *Id.* (emphasis added). The fact that the IGC had granted a "Certificate of Suitability" to the Caesars riverboat project appears to have further defined the purpose to include a casino located at an IGC approved site.

This narrowing of the purpose is more evident with reference to the COE's discussion of alternatives, which clarifies the

---

**23.** This aspect of the *Van Abbema* case has been criticized by the Court of Appeals for the District of Columbia Circuit. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C.Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991); *c.f. Friends of Earth v. Hintz*, 800 F.2d 822, 833 (9th Cir.1986) (COE did not err by taking applicant's costs into account, noting that the COE "must take into account the objectives of the applicant's project"). The *Busey* court found that the *Van Abbema* court had "misconstrued the language of NEPA." *Id.* The "action" to which NEPA refers when commanding agencies to discuss "alternatives to

the proposed action," the *Busey* court wrote, is the "major Federal action," not the applicant's actions. *Id.* "An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving *its* goals, shaped by the application at issue and by the function that the agency plays in the decisional process." *Id.* (emphasis in original). In a Seventh Circuit case of more recent vintage, the court noted *Busey's* disagreement with its interpretation of the proper scope of relevant alternatives, but continued to apply the *Van Abbema* formulation. This Court will do likewise.

general goal of the project. The COE briefly recounted the history of the Indiana gaming law that allowed riverboat gambling to come into being, and noted that the majority of citizens of Harrison County had approved a referendum authorizing riverboat gambling in their county, so the fourth Indiana gaming license was designated for Harrison County. Findings at 55. "Therefore, the review of alternative sites was limited to areas bordering the Ohio River within the limits of Harrison County." *Id.* The COE also noted Harrison County's close proximity to the Greater Louisville market, which meant "the potential existed to generate substantial gaming revenue from a facility located within the confines of that county." *Id.* This finding suggested that close proximity to the Louisville market was also part of the purpose for the action. Finally, the District Engineer noted that the Certificate of Suitability for Harrison County was awarded to Caesars "for a *site specific location,*" that is, the property for which Caesars sought a permit. Findings at 56 (emphasis in original). For these reasons, the COE has argued that it was obligated to consider only a "narrow range of alternatives in conducting its NEPA review." COE's Brf. in Supp. at 23.

The parties disagree about whether these factors obligated the COE to limit the range of alternatives it should consider. Yet, even if the factors did not obligate the COE to limit its consideration of alternatives, they certainly influenced the analysis of each. Given that the purpose of the action was to facilitate the acquisition of an Indiana gaming license to operate a riverboat casino on the Ohio River in Harrison County, it would seem reason-

able for the COE to disregard alternative sites that had been rejected by the IGC.[24] As the COE argues, the IGC is charged with responsibility for regulating riverboat gaming licenses, and choosing among competing applicants those that "promote the most economic development in a home dock area and that best serve the interests of the citizens of Indiana." Ind.Code § 4-33-4-1(a)(5). If the general goal of the federal action is to obtain a license from this commission, then it follows that the only alternatives to be considered would be those that meet the commission's criteria, as evidence by a Certificate of Suitability. Other relevant criteria include voter approval of gambling in their county, siting on the Ohio River, and a location in a county in which a riverboat does not already exist. As previously noted, for purposes of the floodplain alternatives analysis, it is significant that the proposed activity is water dependent. All of these factors would be expected to influence the COE's discussion of alternatives in the EA.

 Although the IGC had issued a Certificate of Suitability to Caesars, the COE considered and discussed all four competing sites in Harrison County, including the Caesars' site, that had been considered by the IGC, as well as the alternative of "no action," and project modification. This exercise of administrative caution is reasonable. The plaintiffs complain, however, about the extent of discussion of the other sites and argue that the COE did not adequately consider the alternative site located in Mauckport, Indiana. That site had approximately 250 acres available, with about 210 of them covered

---

24. The Court acknowledges the guidance obtained through the COE's citation of cases standing for the proposition that "legislation approving a specific project" narrows the agency's obligation to discuss alternatives. *See Izaak Walton League v. Marsh,* 655 F.2d 346, 372 (D.C.Cir.1981) ("When Congress has enacted legislation approving a specific project, the implementing agency's obligation to discuss alternatives in its environmental impact statement is relatively narrow."); *see*

*also Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir.1984) (in deciding whether an alternative is reasonable, courts "may certainly take into account the strength and vitality of legislation that forbids it."). While analogous, these cases are not exactly on point with the unique situation in this action, which is why the Court grounded its decision regarding the reasonableness of the COE's alternatives assessment on the purpose for the action.

by a sand and gravel operation. Findings at 56. The remaining forty acres had already received a § 404 permit for construction of a recreational marina. *Id.* The COE noted that the sand and gravel pit would require "extensive rehabilitation to provide a suitable setting for a destination resort." *Id.* It also presented the possibility of "contamination problems from heavy equipment, fuel, and other petroleum products associated with a quarry operation." *Id.* Further, this site was more than forty-five miles from the "targeted Greater Louisville market," and people from that area would have to travel through a "highly developed commercial area enroute to this site." *Id.* Finally, the COE noted that, "based upon known resources within the immediate area as identified during the DA permit process for the recreational marina, the potential for significant archeological sites being located within the proposed construction area is high." *Id.* All of these findings were supported by the record and were not arbitrary or capricious.

 When making his final evaluation before issuing the permit, the District Engineer stated that his review of alternatives revealed that each alternative involved similar discharges of dredged or fill material into navigable waters. Findings at 67. Each would require construction of a docking facility that would involve dredging, filling, and securing features. *Id* As mentioned above, the COE also observed that extensive rehabilitation would be necessary at the Mauckport site, which would presumably add to the expense of the project. Although the possible contamination at the Mauckport site was discussed, the District Engineer did not specifically mention its probable consequence of significant cleanup costs and delays. That consequence is implicit, however, in the finding that Mauckport's prior use as a quarry may have caused soil contamination. To be practicable, an alternative must be capable of being done, "taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). It was not arbi-

trary, capricious, unlawful, or an abuse of discretion for the COE to consider that added costs, extensive rehabilitation, possible contamination, and the logistics of travel to the Mauckport site, rendered that site not a practicable alternative. Nor was the assessment of any of the other alternative sites arbitrary or capricious. The District Engineer specifically found that there were "no practicable alternatives to the proposed discharge which would have less adverse impacts on the aquatic ecosystem." Findings at 67.

The Court is not convinced that the COE was even required to consider the other potential riverboat sites that had been rejected by the IGC in connection with this permit application. If not, then the COE's assessment of the alternatives of no action, that is, denial of the permit, and modifications to the project, satisfied the administrative duty to take a hard look at alternatives. *See Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 194 (D.C.Cir.1991) (noting that NEPA only required agency to approve or deny permit when federal agency acts, not as a proprietor, but "to approve and support a project being sponsored by a local government or private applicant"). Not only did the COE consider specific project modifications as practicable alternatives, but some of the modifications became conditions of the permit. For example, a possible modification was the re-routing of utility lines and relocating the utility plants to avoid impacts to sensitive resources. AR Vol. XV, Tab 200, Eco–Tech Report at 6. One of the permit conditions stated that "the utility corridors ... shall not be placed within the bluff area." Findings at 70, Permit Cond. (i). As in *Busey,* this case presents a federalism situation in which the agency is faced with a project sponsored by a private applicant and tentatively approved by a state commission, pending federal § 404 permit approval and other requirements. Because there are no cases that direct the COE or the Court's decision-making about the degree of deference owed to the state commission's decisions, or the extent of

alternatives that must be considered in unique circumstances such as those presented by this riverboat gambling project, the Court cannot find the strategy used by the COE arbitrary, capricious, unreasonable, unlawful, or an abuse of discretion.

In an effort to convince the Court that the COE's consideration of alternatives was arbitrary, capricious and contrary to law, the plaintiffs criticize the COE's reliance on information obtained from Caesars' consultant, Mark Saunders ("Saunders") of Thompson Engineering. Pls.' Brf. in Supp. at 14. One of the criticisms is that Saunders' reports did not reveal his qualifications or the methodologies he used for the alternative site analysis. Another is that he was acting as Caesars' advocate. *Id.* In fact, the plaintiffs state that "nothing in the record suggests that Mr. Saunders was objective, neutral or disinterested." *Id.* That is not the test, however, in a challenge to an agency decision. Instead, the plaintiffs must show that the COE's decision to accept and utilize the report from Saunders was arbitrary, capricious or an abuse of discretion. "The Corps certainly may utilize reports and facts derived from outside reports and sources," unless they have been "specifically challenged." *Van Abbema,* 807 F.2d at 639. This means that the plaintiffs must point to "concrete evidence, readily available to [the agency] during its decisionmaking process, that the ... [agency] relied on a materially distorted picture," when making its decision. *Alschuler,* 686 F.2d at 484.

Here, the plaintiffs have offered the opinions of Earl Becker ("Becker"), the chairman of PORE, Dr. Claude Baker ("Dr.Baker"), one of its board members, and Arthur W. Mengel, Jr. ("Mengel"), owner and developer of the Mauckport site. The Court will briefly address each challenge. Becker, who "twice submitted criticisms of the allegations and conclusions offered by Mr. Saunders." Pls. Br. at 15. His "criticisms," however, amount to nothing more than his own personal disagreement with Saunders, based on his

opinions about the Mauckport site. Although it would have been useful for the COE to explain in its Findings how it resolved the conflicts among the commentators and experts regarding this alternative, even a cursory review of the record reveals several obvious reasons.

First, the District Engineer reasonably proceeded under the assumption that the decision of the IGC regarding the best site for the riverboat in Harrison County deserved some deference. Second, he recognized that the fundamental purpose of the permit was to allow the dredging and filling activities to proceed in the waters of the United States, and that each of the alternatives, in his opinion, involved a similar level of that activity. Given this backdrop for his decision, the District Engineer did not require a great deal of evidence to be convinced that the Mauckport site, or any other alternative, was less practicable. The fact that more than 200 acres of the Mauckport site would have to be completely rehabilitated before any construction could begin was enough for Col. Spear. The Court cannot find that decision arbitrary and capricious.

In light of this finding, challenges to the specific evidence used for the analysis of alternative sites begins to pale. The plaintiffs point to specific comments in the record that either criticize the choice of the Townsend site (Caesars' property) over Mauckport, or challenge the conclusions regarding Mauckport offered by Saunders. Saunders' report was unverified, they argue, making it arbitrary or capricious for the District Engineer to give much weight to the information and conclusions contained therein. Pls.' Reply at 4. Although the plaintiffs do not contend that Saunders' report should have been disregarded, they object to the fact that the District Engineer failed to independently verify it. *Id.* at 5. They argue the District Engineer should have *documented* such verification and responded to specific challenges to the accuracy and reliability of the information, before relying so heavily on it. *Id.* Instead

of dealing with the specific challenges to the report, they contend, the COE merely cited its consultations with the USFWS, IDEM, IDNR, and IDOT as its means of verifying the report. *Id.*

Upon review of the record evidence cited by the plaintiffs to show that the Thompson Engineering alternatives analysis was specifically challenged, the Court is hard-pressed to find any specific challenge that was based on anything other than a difference of opinion. Plaintiffs point to the comments of PORE's chairman, Becker, which they contend offer proof of the following:

1. the Mauckport site would be much less seriously impacted by flooding than the Bridgeport site;

2. Buck Creek (near Mauckport) would not be adversely impacted by a casino development; and

3. Saunders had no factual basis for his concerns about Mauckport's impacts on a mussel bed and archaeological sites.

AR Vol. XXVIII, Tab 234L, Item 696, Letter from PORE dated Dec. 9, 1997; AR Vol. XXIX, Tab 234M, Item 690, Letter from PORE dated Jan. 14, 1998. In his December letter, Becker questioned the comparative impact of flooding at the two sites, noting that the drop in river elevation between Bridgeport and Mauckport is approximately 8 feet, according to the Ohio River profile. AR Vol. XXVIII, Tab 234L, Item 696 at 3. Becker continued by stating, "[c]onversations with residents of Mauckport about the infrequent flooding of Hwy. 11 restricting their access to Hwy. 135 and comparing this to my personal experience and public records of the flooding of Hwy. 111 at the Bridgeport site confirms this." *Id.*

With respect to the impact on Buck Creek, Becker wrote, "I am especially upset about the comments concerning Buck Creek because they describe Knob Creek and its related habitats." *Id.* Unlike Knob Creek, which runs through the Bridgeport site, Buck Creek is upstream from the potential Mauckport site. *Id.* For that

reason, he surmised, storm runoff would not pollute Buck Creek. *Id.* His comment about the mussel bed was that Saunders' concern about possible impacts to the mussel at Mauckport "is ridiculous compared to the inevitable impacts to the mussel bed at the Bridgeport site." *Id.* Becker concluded by stating that "many other problem issues of inaccuracies and incompleteness related to the alternative site assessment" exist, but "we feel that the above comments are enough to show that this document does not provide the 'high quality' information that is required under NEPA" *Id.* at 4.

While Becker's comments seem to express clearly the views held by members of his organization, they do not prove that the site assessment performed by Saunders for Thompson Engineering was inaccurate, misguided, or without a factual basis. The plaintiffs emphasize that Becker's comments were based on his "personal knowledge," and cite his January 14, 1998, letter as proof of his sources of information. In that letter Becker stated that he had reviewed the alternative site analysis prepared by Thompson Engineering for Caesars that led to Caesars' selection of the Bridgeport site. AR Vol. XXIX, Tab 234M, Item 690. The purpose of his letter was to inform the COE about several determinations in that analysis that "run counter to the knowledge, experience and opinions of members and supporters of PORE." *Id.* at 1.

According to Becker, PORE decided to "search the public record to see what information was available" during the period of Caesars' alternative site analysis. *Id.* Becker stated that he reviewed the "Mauckport area during [PORE's] efforts [to deal] with unauthorized dumping in Harrison County in the late 80s to early 90s." *Id.* He also revisited the area during the time when the River Valley Marina Associates project was announced. *Id.* at 2.

My own determination was that the area involved had been intensely farmed for

an extended period and that the project had little potential for significant environmental damage. The extreme economic distress of the area led me to feel that the proposal would serve as an important, much needed, contributor to the local economy and would help further the county's efforts to promote this portion of Harrison County as a tourist attraction.

*Id.* In addition, during the time when the IGC was considering the four alternative sites in Harrison County, Becker took several people on tours of the various sites, and they all agreed "that the Mauckport area contained significant areas suitable for development of river dependent commerce in an environmentally acceptable manner and was the most desirable site." *Id.*

Becker stated that he reviewed the documentation on file with the COE in relation to the proposed marina at the Mauckport site, for which a permit was granted in 1993. *Id.* He also reviewed the file for the Horseshoe Gaming proposal (the Mauckport riverboat proposal), and "had conversations with Mr. Art Mengel of River Valley Marina and Mr. Leon E. McKinney ... who represented Horseshoe Gaming" in that proposal. *Id.* Guided by this research, Becker reviewed the information about Mauckport in Saunders' alternative site analysis and compared it with his own findings. *Id.* As a result, he concluded that Mauckport was the best site for a riverboat gambling facility. Based on his own research and personal experience, he disagreed with Saunders' statement that the potential for flooding problems at Mauckport might be worse than at Bridgeport. *Id.* at 4. He expressed PORE's position that the Mauckport site offered a better method of controlling silt during dredging operations than at Bridgeport. *Id.* at 5. Essentially, Becker expressed many concerns about the viability of certain aspects of the Caesars' project and his feeling that the Mauckport site would not present the same difficulty.

In sum, Becker's opinions were based on his review of the prior permit applications for Mauckport, his own visits to the site, conversations with other PORE members, discussions with the proponents and likely developers of a gaming vessel at Mauckport, and a review of Saunders' report. Other than his status as chairman of PORE, an organization whose members are committed to promoting orderly, planned development that will improve the quality of life, and opposing any attempt to locate a gambling casino in their area of Harrison County, Becker offers no other evidence of his qualifications to opine on environmental issues. Having reviewed Becker's letters, the Court is not convinced that they contain anything that would cause the COE to doubt the veracity, accuracy, reliability or basis for the Thompson Engineering alternative site analysis. Instead, the letters articulately reflect the position of PORE, one of the plaintiffs in this action and an outspoken opponent to the issuance of a permit to Caesars for construction of a mooring facility for a riverboat in Bridgeport.

Turning to the comments of another PORE member, the Court notes that Dr. Baker's letter contains even less evidence of the basis for his opinions. *See* AR Vol. XXI, Tab 234E, Item 292. The fact that Dr. Baker is a professor of Biology at Indiana University's Southeast campus, and board member of PORE, does not qualify him to opine as an expert on the relative non-biological merits of the Bridgeport and Mauckport sites. Moreover, the same or similar comments were presented to the COE in other letters and at the public hearing, and were reflected in the record and the Findings, along with Caesars' responses. By documenting receipt of these comments, Caesars' responses, and the various other documents, reports, interagency meetings, recommendations, agreements, and comments that it considered, the COE adequately considered the specific challenges to the alternative site analysis.[25]

---

25. Again, the COE could have been of greater assistance to the reviewing court either by expressing in its Findings how it resolved the

Judging from the number of pages devoted to the comments of another person, Mengel, the plaintiffs appear convinced that the COE relied on faulty information about the Mauckport site. Beginning with a letter to the COE dated November 5, 1996, Mengel began advocating for a denial of the § 404 permit for Caesars and a corresponding consideration of a permit for the Mauckport site. AR Vol. VI, Tab 61A, Item 60, Letter from Mengel dated Nov. 5, 1996. Mengel is the president of the River Valley Marina Associates, in Prospect, Kentucky, and an owner of the property at Mauckport that was approved in 1993 for a marina, and was intended to be the site of the Horseshoe Casino and Hotel at Mauckport. *Id.* According to Mengel, his site came "very close" to being selected by the IGC over the Bridgeport site of Caesars. *Id.* "Had the Gaming Commission more carefully evaluated the promises made by Caesar's [sic], Caesar's would not have been selected." *Id.* This first letter outlined the relative advantages of the Mauckport site over the Bridgeport site, including the fact that Mauckport already had the permits necessary for construction of a marina. *Id.* Mengel also pointed out that his site was located in a commercial area, and that all dredged materials would be used on site, the river would not have a lot of barge traffic in this location, the boat could cruise for fourteen miles, there would be no air quality problems in the area, no mussel beds, no endangered species or their habitat to impact, and no wetlands. *Id.* A distinct advantage, according to Mengel, was that the golf course would be located next to the hotel, and the Mauckport site has received the endorsement of all adjacent property owners and nine out of ten nearby towns. *Id.* In sum, Mengel stated that his site would have fewer environmental impacts, opponents, air quality problems, and no serious traffic problems. *Id.* at 4.

In the next letter by Mengel, written to Kentucky congresswoman Anne Northup, he expressed his concern about, and sought her assistance with stopping, the possible approval of Caesars' COE permit. AR Vol. XI, Tab 127, Letter from Mengel dated Mar. 1, 1997. Mengel wrote that Caesars' project would cause pollution in the Louisville nonattainment area; would impact wetlands in Kentucky near the gondola parking lot; would cruise "directly over the top of a large fresh water mussel bed" and "destroy it;" and would have a "tremendous negative impact on Churchill Downs and the thoroughbred industry." *Id.* at 1. He also accused Caesars of poor site selection, and observed that Caesars' application was "greatly misstated and is very misleading to the public as a whole." *Id.* at 2. After pleading with Congresswoman Northup to ask the COE to hold another public hearing, Mengel informed her that if Caesars's project were to be stopped, "the project, without a doubt, would be moved thirty (30) miles down river to a site in Mauckport, Indiana." *Id.* At that location, Mengel reported, there would be no environmental problems and the project would have a positive impact on Kentucky. *Id.* It would not affect the air quality in Louisville or Kentucky's wetlands or mussel beds. *Id.* Mengel also asked the congresswoman to specifically find that the project required an EIS, or to ask for an outright denial of the permit. *Id.*

Later in 1997, Mengel again wrote to the COE and referred to Thompson Engineering's August 1997 alternative analysis, prepared by Saunders, calling it "absolutely fraudulent" and the "result of fabrication." AR Vol. XV, Tab 206, Letter from Mengel dated Dec. 8, 1997 at 1; Pls.' Brf. in Supp. at 16. According to the plaintiffs, in this letter to the COE Mengel "identified numerous specific, relevant facts that contradict Mr. Saunders' omissions, assertions and conclusions." Pls. Br. at 16.

challenges, attaching a separate report, or including affidavits or other testimony to clarify the record. The Court was able to discern

the resolution, but would have preferred it to be a less arduous task.

Such an accusation requires the Court to carefully review this letter in light of the record. It will do so, again, without the assistance of specific findings, reports, affidavits or testimony from the COE.

Among the alleged inaccuracies, Mengel noted that the Mauckport site was not designated correctly on the Thompson Engineering map, and it was incorrectly described as an abandoned quarry, when it is really an operating sand and gravel pit. AR Vol. XV, Tab 206 at 1. Moreover, Saunders "blatantly forgot" to mention that the forty acres not being mined have already received a COE permit for construction of a marina, and that the property is zoned commercial. *Id.* With respect to the Townsend site, Mengel wrote that Saunders had omitted reporting that part of the site is located in Floyd County, where voters had twice defeated a referendum on gambling, and the remaining property has so many environmental and archaeological problems that a hotel and parking facility can barely fit on it. *Id.* at 2. Expressing doubt that the Townsend site actually meets all of Caesars' design criteria, Mengel opined that "the project is highly suspect of not being economically sustainable and is certainly not environmentally sustainable as they suggest." *Id.* Finally, he observed that Caesars' failed to state that the Townsend site is located in a quiet, undeveloped residential area and the project will mean a complete change in land use. *Id.*

Regarding comparative construction issues, Mengel noted that the sand and gravel pit would be reclaimed, offering the opportunity to construct a unique golf course, and that it would not have drainage problems as Caesars suggests. *Id.* Nor would it have any serious flooding problems. According to Mengel, reclaiming the pit would be "both economically and environmentally sustainable." *Id.* Many more construction issues were identified by Mengel at the Townsend site, including that its proximity to State Road 111 presented a dangerous and unsafe design challenge, and that it is subject to frequent and serious flooding. *Id.* In re-

sponse to Caesars' emphasis on the fact it had obtained a permit from IDNR approving floodway construction, Mengel accused Caesars of redefining the "floodway line," without the knowledge or approval of the Federal Emergency Management Agency. *Id.* Caesars did this, he contends, by using a "technically flawed HEC II study" and manipulating other data. *Id.*

Moving to access issues, Mengel stated that the Mauckport site has the best ingress and egress of all the alternative sites, because it is served by several major arteries and the area is not already congested. *Id.* at 3. In contrast, the Townsend site can only be accessed via S.R. 111, and its traffic would cause congestion, pollution, and back-ups on the Sherman Minton Bridge over the river. *Id.* Caesars also "neglected" to mention that the road to the off-site golf course is very narrow and winding with steep grades. *Id.* The environmental comparison, however, yielded the greatest difference between the sites, Mengel asserted. According to his comparison, the description of Mauckport in Saunders' report more accurately describes the Townsend site. *Id.* Noting that his site was "cleared" of all biological issues by state and federal wildlife agencies and the COE, Mengel stated that not only was it "highly unlikely" that the pit is polluted, but reclaiming it would restore habitat for wildlife. *Id.* Mengel called Caesars' concern over the small mussel bed downstream of his property "ludicrous" considering that Caesars' site has "a very large mussel bed that runs the entire length," which Caesars will "greatly impact and possibly destroy." *Id.* Finally, Mengel reiterated, "[t]here are *no wetlands* on this site." *Id.* at 4 (emphasis in original).

In addition, Mengel disputed the location of an alleged archaeological resource at Mauckport—the site of Col. John Morgan's crossing during the Civil War—calling Saunders' reference to it "total fabrication." *Id.* Instead, he claimed that the Mauckport property "has been cleared of

*all cultural resources* by State and Federal agencies." *Id.* (emphasis in original). Mengel pointed out that Caesars' site is "rich with numerous archaeological sites," and calls these problems "one hundred times greater" than Mauckport's. *Id.* at 5. The site's water quality is so good, he claims, IDEM issued a waiver of the CWA 401 Water Quality Certification, and city water is available to the site, although there is no sewer system. *Id.* Referring to the fourteen special conditions on Caesars' Water Quality Certification, Mengel stated this shows the degree of water quality problems the Townsend site has. *Id.* According to Mengel, IDEM stated that Caesars' mussel survey was "unacceptable" and that Caesars would have to do a credible study meeting IDEM's approval, which has not yet been done. *Id.* He also accused Caesars of "intentionally avoiding" the subject of air quality when comparing the two sites. *Id.*

Another of Caesars' fabrications, Mengel asserted, is the statement that travel time for emergency vehicles would be excessive at Mauckport due to difficult access. *Id.* The Mauckport site is fourteen miles from Corydon and three miles from Brandenburg, Kentucky, he wrote, and emergency vehicles would have access from both directions. In contrast, the Townsend site only has one way in and one way out of the project. *Id.* at 6. While accusing Caesars of having no cruise route for its vessel, Mengel extolled the benefits of the two mile cruising lane available to a vessel at his site, and noted that the path was wide enough that the vessel could even turn around and return. *Id.* at 5. In sum, Mengel wrote that the Mauckport site is "far superior" to the Townsend site, and that it should be obvious to the COE that Caesars falsified and fabricated information in their alternatives analysis.

[T]heir alternative analysis is an insult to the intelligence and integrity of you and your staff and one would think that once the [COE] has been put on notice that an applicant for a permit has attempted to deceive them ... that the [COE] would immediately deny their permit application.

*Id.* at 7.

Although the District Engineer did not specifically mention all of the challenges raised by Mengel to the Thompson Engineering analysis of alternatives, the Court is certainly capable of discerning what happened. First, the COE was not convinced that it even had to do an extensive analysis of alternatives, given the unique circumstances of this application that have already been noted. Second, the challenges to the veracity of Thompson Engineering's report came from someone who is not only unqualified to render an expert opinion about many of the technical issues involved, but who also cannot be considered impartial. As the owner of the Mauckport site, Mengel was very interested in the COE denying Caesars' permit application, which he believed required the casino to be moved to another location—Mauckport. Third, even a cursory review of the record evidence reveals that the alleged omissions by Caesars were already a part of the record, and the disputed "facts" by Mengel were no more than his own opinion. As the Court has noted, Mengel does not qualify as a neutral and objective observer, much less an environmental or engineer expert.

Finally, some of the statements made by Mengel were simply not true.[26] For instance, in his March 1, 1997, letter to Congresswoman Northup, Mengel wrote that the gondola would destroy wetlands in Kentucky, but by the time of that letter

---

**26.** Although the Court mentioned only a few of the more obvious inaccuracies in Mengel's letters, it notes others that the COE could have seen through. Mengel asserted that Caesars' boat would cruise "directly over the top of a large fresh water mussel bed," which the District Engineer knew to be inaccurate. He also reported that IDEM stated that Caesars' mussel survey was "unacceptable" and that Caesars would have to do a credible study meeting IDEM's approval, when a brief review of IDEM's letter reveals no such statements.

the gondola had been eliminated from the project. He also stated that his site would have no serious flooding problems, but the attachments to his December 8, 1997, letter to the COE contained three permits from IDNR for construction in a floodway for the forty acres of this site to be developed as a marina. Even more telling is the fact that in both of his letters to the COE, Mengel stated that the Mauckport site had no wetlands. Yet, among the attachments to a comment letter in the record to which the plaintiffs have directed the Court for other evidence is a "Wetland Delineation Report" for the Horseshoe Casino Site, prepared by American Consulting Engineers, Inc., on April 4, 1996. AR Vol. XXIX, Tab 234M, Item 690. In it, the consulting engineer wrote, "[t]hirty wetlands and 'waters of the U.S.' were identified on or near the Horseshoe Casino property in March, 1996." *Id.* at 10. Two of them, the consultant noted, would need to be "re-evaluated later this spring when floodwaters recede to determine their wetland status." *Id.* These statements confirm both the existence of wetlands at the Mauckport site and the fact that it floods.

In light of the stake Mengel had in the outcome of the permit decision, his lack of credentials for rendering opinions about the biological and environmental status of his site, and the obvious misrepresentations in his letters, the COE understandably relied instead on the information provided by Thompson Engineering regarding the alternatives. Moreover, upon their face, Mengel's letters contain the type of inflammatory rhetoric and histrionics that lacks persuasiveness, and is often offered as a substitute for the facts. The cited materials do not render the COE's decision about the alternatives arbitrary, capricious or an abuse of discretion.

The plaintiffs have also criticized another environmental assessment prepared by Eco–Tech, Inc., that included a discussion of alternatives from which the COE quoted in its alternatives assessment. *Id.* Their primary objection was that the Eco–Tech document did not identify its author, its sources of information, or its methodology.

As with the plaintiffs' objections to the COE's reliance on Saunders' work, the objections about Eco–Tech do not demonstrate that the COE relied on a "materially distorted picture," when making its decision. *See Alschuler,* 686 F.2d at 484. Rather than just questioning the basis for and credentials of the Eco–Tech report, the plaintiffs should have pointed to documents or comments in the record that would prompt a reasonably busy District Engineer to make further inquiries about a professionally-prepared report or the credentials or reputation of a consultant hired by an applicant. Perhaps the plaintiffs thought that by pointing to comments from people who disagreed with the conclusions of the report they adequately demonstrated that the report had been specifically challenged. Again, the mere fact that others disagree with an expert's methods or conclusions does not make those methods and conclusions wrong. *See Marita,* 46 F.3d at 622–23 (NEPA's requirements are "designed to ensure open and honest debate of the environmental consequences of an agency action," not to dictate specific decisions); *see also Carmel–by–the–Sea v. United States Dept. of Transp.,* 123 F.3d 1142, 1151 (9th Cir.1997) (NEPA requires "reasonably thorough" discussion of environmental consequences, "not unanimity of opinion, expert or otherwise."). The objectors needed to point to specific inaccuracies in the Eco–Tech report, based on objective evidence and not just opinions. Absent such evidence, the plaintiffs' objections do not compel a finding that relying on Eco–Tech's report was arbitrary or capricious.

### E. The Public Interest Review

When any environmental impacts of a project such as the riverboat casino have been identified, the COE is obligated to also conduct a public interest review before issuing a permit. 33 C.F.R. § 320.4(a); *Van Abbema,* 807 F.2d at 638. The process of collecting comments from the public and from other agencies and experts, holding public hearings, conduct-

ing interagency meetings, and reviewing all of the relevant materials forms the basis for the COE's public interest review of a proposed action. Specifically, the regulations provide that:

All factors *which may be relevant to the proposal* must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1) (emphasis added). This review calls for a balancing of negative and positive impacts of the proposed project in light of the public interest. The agency is in the best position to determine which impacts are relevant to performing the balance, *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718, but the court is expected to review the agency's determination for an abuse of discretion. *Marita*, 46 F.3d at 619 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

 Even though a court is required to conduct a searching and thorough review of the agency's exercise of discretion, it is not allowed to substitute its own judgment for that of the agency. *Marita*, 46 F.3d at 619. Instead, the court is charged with assessing whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citing *Motor Veh. Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Given that the Court's review here occurs in the context of a challenge to agency action

under the APA, the plaintiffs, Hoosier, POW and PORE, bear the burden of proving that the agency made any of these mistakes in conducting its review of the permit application. *Id.*; *see also Holmes v. Department of Veterans Aff.*, 58 F.3d 628, 632 (Fed.Cir.1995); *Sierra Club v. United States Army Corps of Eng.*, 935 F.Supp. 1556, 1565 (S.D.Ala.1996) (a logical corollary of the APA's deferential standard of review and the "presumption of regularity" that attaches to agency decisions is that a party challenging agency action must bear the burden of establishing the agency acted in an arbitrary or capricious manner).

 The COE must balance the impacts in light of the twenty enumerated factors in the regulations listed above. The specific weight to be given any one factor depends on its "importance and relevance to the particular proposal," as determined by the District Engineer. *Id.* In determining the relative weight to be assigned the factors, the District Engineer is to give "full consideration and appropriate weight" to "all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." 33 C.F.R. § 320.4(a)(3). The balancing of all these factors enables the COE to decide whether to issue a permit, and what conditions should be attached to it. 33 C.F.R. § 320.4(a).

The plaintiffs present three basic arguments to prove that the public interest review conducted by the COE in this case was arbitrary, capricious and contrary to law. First, they contend that because of the numerous arbitrary and capricious decisions the District Engineer made in connection with his consideration of impacts and alternatives, the public interest review was defective as a matter of law. Because the Court has found that the District Engineer's decisions were not arbitrary, capricious, an abuse of discretion, or contrary to the law, this argument is unavailing. Second, the plaintiffs argue that the public interest review failed to consider the socio-

economic costs of gambling. Those costs, they assert, include the impacts of compulsive gambling, alcohol consumption, crime, and other social issues related to gambling. Noting that the District Engineer specifically declined to discuss the relative desirability of gambling, the plaintiffs argue that he ignored the projects' social impacts.

■ The Court cannot agree. The relative value of legalized gambling to the citizens of Indiana has been decided by the General Assembly, and the citizens of Harrison County, who voted in favor of a riverboat gambling casino in their county. As the COE has noted, the primary responsibility for deciding land use issues lies with the state and local governments, unless there are significant issues of overriding national concern. No such issues were identified for the District Engineer or this Court. On the contrary, the materials designated by the plaintiffs as proof of the socio-economic cost of gambling serve instead to demonstrate a lack of consensus among experts as to the relative effect of gambling on society and the economy. It is not the task of the COE, however, to resolve disagreements among experts. *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. Rather, the COE must be informed about the disputes and give whatever weight to this factor that he deems warranted. *Id.* The Court's job is to determine if the District Engineer's decision about this factor is arbitrary or capricious, not whether it is wrong. *Id.* It is not the job of the Court to second-guess the District Engineer's decisions. *Simmons,* 120 F.3d at 669; *Van Abbema,* 807 F.2d at 636. Moreover, the mere existence of a dispute or controversy about a factor does not mean that the COE reached a decision that is arbitrary or capricious. None of the materials cited by the plaintiff suffice to render the COE's reliance on the expertise and decisions of the Indiana General Assembly, the IGC and the citizens of Harrison County arbitrary and capricious with respect to gambling.

■ Finally, the plaintiffs assert that the COE failed to undertake any meaningful consideration of the economic impacts of the proposal, relying instead on the fact that a business is presumed to have determined that a proposed project would be economically viable. *See* 33 C.F.R. S. 320.4(q). Claiming that the riverboat will have a dramatic and unprecedented economic impact on Southeast Indiana, the plaintiffs accuse the COE of failing to balance that impact with the others. Primarily, they point to a finding in which the District Engineer included "economics" in a list of factors he considered and found that the proposed project would not significantly impact. *See* Findings at 59. When considered in the context of the entire section, however, the reference to economics appears to imply that he found no significant adverse impacts to economics. This reading is consistent with the District Engineer's specific finding elsewhere that "economic benefits would accrue from" the Caesars' project in Harrison County. No amount of emphasis on the positioning of economics in that listing would convince this Court that the COE failed to consider, much less balance, the economic impacts of the project.

As the COE has noted, the record contains sufficient evidence, which the District Engineer is presumed to have considered, showing economic benefits from the proposed project. *See Motor Veh. Mfrs. Assoc.,* 463 U.S. at 44, 103 S.Ct. 2856 (noting presumption of regularity afforded agency that is fulfilling its statutory mandate); *Akiak Native Comm.,* 213 F.3d 1140 (same). The Center for Urban Policy at Indiana University documented the fiscal benefits expected to flow to the county if the Caesars project were constructed. AR Vol. VIII, Tab 65, Sec. IV, p. 44. This study was performed for the IGC prior to its issuance of a Certificate of Suitability to Caesars. In addition, Harrison County commissioned a task force to study, among other things, the potential economic benefits of riverboat gambling to the county. AR Vol. VIII, Tab 65, Att. "Harrison

County Riverboat Casino Task Force Report." It documented the contributions such a casino would be expected to make to the county and its citizens. *Id.* at 7 (Economic Impact). Finally, the IGC selected the Caesars' project from among four competing riverboat gaming proposals for Harrison County to be awarded a Certificate of Suitability. Such a certificate communicates a finding that the Caesars project is expected to offer the most economic development in its home dock area and best serve the interests of the citizens of Indiana.

The process used by the IGC for selecting an applicant to be awarded a Certificate is intended to achieve this result. Specifically, the IGC is required to perform a "background investigation, including economic development analysis of the applicant. . . ." Ind. Admin. Code, tit. 68, r. 2–1–5(a)(2) (2000). After the background check, the IGC must conduct a public hearing, at which the IGC and members of the public may "question the applicant on any aspect of its application and presentation." *Id.* 2–1–5(b). During the course of its presentation, the applicant "must present evidence that it meets or possesses" certain designated standards, qualifications or criteria. *Id.* 2–1–5(c). Those include the qualifications set forth in the Indiana gaming law, possession of a "high level of skill, experience, or knowledge necessary to conduct a riverboat gambling operation," and proof of the "positive economic impact that the applicant's plan will have on the entire state of Indiana." *Id.* The first step an applicant usually takes after obtaining a Certificate of Suitability is to apply for a permit to develop its riverboat operation from the COE. *Id.* 2–1–5(e). That is precisely what Caesars did. Given the obvious goals of the process for determining a Certificate of Suitability, the COE cannot be said to have acted arbitrarily or to have abused its discretion by considering this Certificate when determining the economic impact of the proposed project.

"For all these reasons, the Court finds that the District Engineer's public interest review was not arbitrary, capricious or contrary to law. As the Supreme Court has observed, if the COE has adequately identified and evaluated the adverse environmental effects of the proposed action, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* at 350. "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The plaintiffs have not succeeded in proving to the Court that the COE's decision to issue a permit to Caesars was uninformed, despite their extensive efforts to show that it was unwise.

### III. CONCLUSION

The Court has reviewed the plaintiffs objections, arguments and citations to the administrative record, and has found no reason to upset the decision of the COE to issue a permit to Caesars for its riverboat operation. During the course of this review, the Court **GRANTED** the defendants' motion to strike filed on June 24, 1999. It also found that, in issuing the permit for construction and operation of a riverboat gambling facility, the COE did not violate the Administrative Procedures Act, 5 U.S.C. § 701–706 ("APA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d ("NEPA"), the Clean Water Act, 33 U.S.C. §§ 1251–1387 ("CWA"), or section 10 of the Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 403 ("RHA"). The plaintiffs' attempt to obtain a ruling from the Court that would vacate the permit, remand the case to the COE for further review, and enjoin the operation of Caesars' riverboat casino and hotel resort complex until after such review has failed. For the reasons fully expressed in this memorandum opinion, the Court **GRANTS** the defendant's cross-motion for summary judgment, and **DENIES** the plaintiffs' cross-motion. All par-

 

ties, including defendant Caesars, shall bear their own costs.